**COMMONWEALTH of Kentucky,**
**Appellant/Cross–Appellee**

v.

**Shawn TIGUE, Appellee/Cross–**
**Appellant**

2011–SC–000737–DG
2012–SC–000599–DG

Supreme Court of Kentucky.

RENDERED: MAY 14, 2015

COUNSEL FOR APPEL-
LANT/CROSS–APPELLEE: Jack Con-
way, Attorney General, William Bryan

Jones, Assistant Attorney General, Office
of Criminal Appeals, Office of the Attorney
General, 1024 Capital Center Drive,
Frankfort, Kentucky 40601

COUNSEL FOR APPELLEE/CROSS–
APPELLANT: Meggan Elizabeth Smith,
Department of Public Advocacy, Assistant
Public Advocate, 207 Parker Drive, Suite
1, LaGrange, Kentucky 40031

## OPINION OF THE COURT BY JUSTICE NOBLE

This case raises primarily two issues. First, does a defendant's pro se request to withdraw his guilty plea constitute a critical stage of the proceedings at which the right to counsel attaches, and, if so, is that right violated when trial counsel refuses to assist in the request or to seek alternative counsel? Second, does trial counsel's complete failure to investigate an alleged alternative perpetrator constitute reversible ineffective assistance of counsel? The Court of Appeals agreed under the first issue that such a request is a critical stage and that the Appellant, Shawn Tigue, was denied counsel when he sought to withdraw his guilty plea. Based on this error, the court reversed Tigue's convictions and ordered the case remanded "for a new trial."[1]

This Court agrees that Tigue's right to counsel was violated when he asked to withdraw his plea, but disagrees that his conviction should be reversed for that error, as his relief is limited to reversal of the trial court's final judgment, not his guilty plea. This Court nevertheless affirms the judgment of the Court of Appeals on other grounds by reaching the

---

1. The use of the phrase "new trial" suggests that Tigue had already been tried once. Of course, he had not been tried because he entered a guilty plea before trial. The phrase is instead used to describe what happens upon reversing his conviction and vacating his guilty plea: he gets a whole new proceeding at which the question of his guilt may be decided.

second issue and finding ineffective assistance of counsel.

## I. Background

Bertha Bradshaw was murdered in her Bell County home on the morning of April 11, 2003, by a shotgun blast to the back of her left shoulder. At the time she was shot, she was covered and lying in her bed with her head at the foot of the bed and her feet at its head. Several items were taken from the home, including her purse, several bottles of pills and unfilled drug prescriptions, a Remington 12–gauge pump shotgun, and a green canvas "squirrel bag" belonging to Bradshaw's husband. The kitchen door had been damaged and forcibly entered.

A neighbor told the police that she had seen a maroon Chevrolet pickup truck belonging to Shawn Tigue backed into Bradshaw's driveway between ten-thirty and eleven o'clock that morning. When the police located the truck, Tigue was in the passenger seat and his wife was driving. Police stopped the truck, asked them to exit the vehicle, and searched them for weapons. A pill bottle with a scratched-up label and containing three different types of pills was found in Tigue's pocket. Tigue was then arrested and taken into custody. A search of his truck revealed the green squirrel bag containing assorted 12–gauge shotgun shells.

After Tigue was taken into custody, he signed a waiver of his *Miranda* rights and was questioned about the murder by Detective Donald Perry. Tigue appeared to Detective Perry to be high at that time, but the detective concluded that he was still able to comprehend the situation based on Tigue's asking if he could still stop the questioning even after signing the waiver. During this interview, Tigue told detectives that he was prescribed the hydrocodone found in his pill bottle and that he had purchased the other two types of pills, which were both alprazolam (commonly known by its tradename, Xanax). He denied knowing anything about Bradshaw's murder and consented to a search of his house, where detectives found no evidence linking him to the shooting. He was then taken to jail on drug charges.

From what remained of the label on the pill bottle in Tigue's possession at the time of his arrest, Detective Perry was able to determine that it was a prescription for alprazolam written for Bertha Bradshaw that had been filled at a Rite Aid Pharmacy in Pineville, Kentucky, at about noon on the day of Bradshaw's murder. The pharmacist's description of the man who had filled the prescription matched that of Tigue.

The next day, April 12, Detective Perry interviewed Tigue again. Tigue admitted to having filled the prescription at Rite Aid. When questioned about the green bag that was found in his truck, Tigue stated that his neighbor, Danny Smith, had come to his house and given him those items between 10:00 a.m. and noon the day before, effectively pointing toward Smith as the murderer. He said that Smith had told him to fill the prescription and get rid of the bag, and that he could have half of the alprazolam for doing so. Detective Perry then left to try to find Smith.

It is apparently at this time that Tigue would later claim he was overcome with fear that Smith would retaliate against his family. Before Detective Perry was able to locate Smith, dispatch informed him that Tigue had asked that he return. Upon Detective Perry's return, Tigue confessed to breaking into Bradshaw's house, shooting her with the shotgun, and taking the items. After confessing to the crimes, he told the detective where he had hidden the shotgun. He then took the police to the hidden shotgun and consented for

them to retrieve from his house the blue flannel shirt he had been wearing during the commission of the crimes. Tigue was then taken back to the jail and charged with murder and first-degree burglary.

Despite his confession, Tigue thereafter maintained his innocence. He claims that in his first discussion with defense counsel,[2] he told them that his confession was false and that he knew who had actually killed Bradshaw, though he would not say who the killer was. Tigue would later elaborate that while he had in fact illegally entered the Bradshaw home and taken the pills, money, and other items, he had done so only after Smith had earlier shot and killed Bradshaw with the shotgun and told him to go get the items he took. This version of events would have established an alternative perpetrator defense to the murder.

But Tigue never named Smith as the murderer to his counsel, although he claims he tried to tell the DPA investigator, Lisa Saylor, about Smith and what had actually happened, but she "blew [him] off." She allegedly told him there was nothing to be done about it because he confessed. He maintained his innocence from his first contact with counsel and told them he wanted to go to trial. Tigue claimed that his reluctance to name Smith again throughout was driven by his fear that doing so would put his family's safety at risk from retaliation by Smith.

Tigue was arraigned on May 16, 2003, at which time the court found him to be indigent and appointed Cotha Hudson from DPA to represent him. He also entered a plea of not guilty to all charges. Before the final pretrial conference on September 3, Hudson filed a motion for bond, which was denied, and the Commonwealth filed a notice of intent to seek the death penalty based on the statutory aggravator in KRS 535.025(2)(a)(2) of a murder committed during the commission of a burglary.

Tigue was represented at the pretrial conference by another DPA lawyer, Lowell Lundy, who had been assigned as co-counsel once the death penalty was put in play. The case was assigned for trial on March 30, 2004.

Thereafter, the circuit court's record is devoid of any activity in the case until January 12, 2004, when Lundy reluctantly filed, at Tigue's insistence,[3] a motion to suppress the confession and other evidence allegedly obtained in violation of Tigue's constitutional rights. Two days later and with similar reluctance, Hudson filed a motion for a psychiatric examination and in-patient treatment for Tigue, and attached to it a three-page medical record of an emergency room visit for psychiatric care on April 23, 1998.[4] Both motions were

2. Tigue's defense team included Assistant Public Advocates Cotha Hudson and Lowell Lundy (who was later appointed as co-counsel to assist Hudson once the Commonwealth filed notice of its intention to seek the death penalty), DPA investigator Lisa Saylor (now Evans), and DPA mitigation specialist Robin Wilder.

3. Tigue wrote several letters to DPA Eastern Regional Manager Roger Gibbs during his incarceration in the Bell County Detention Center. These letters show that Tigue had voiced complaints about his attorneys' performance and requested appointment of other

counsel at least as early as September 2003 (Gibbs's earliest reply to Tigue is dated September 18, 2003). Tigue complained, among other things, that his counsel had ignored his repeated requests to seek suppression of his incriminating statements without even considering the grounds he believed might warrant suppression. He also raised similar complaints about his mental and emotional condition and desire for psychiatric evaluation and treatment.

4. According to the emergency room records, Tigue was admitted for in-patient psychiatric evaluation of possible major depression; he

noticed for hearing on January 23, but Hudson agreed at the hearing to have both held in abeyance. Lundy orally moved to withdraw the motions at a subsequent hearing on January 27.

Leaning heavily on the confession, Tigue's counsel was quite candid and unambiguous about the fact that their entire pre-trial strategy had been geared solely toward brokering a plea deal with the Commonwealth to avoid the possibility of a death sentence. Despite his counsel's advice to seek a plea bargain, Tigue initially refused to consider pleading guilty and instead insisted on going to trial to prove that he was not Bradshaw's murderer. His months-long obstinacy ultimately ended on February 2, 2004, however, when he capitulated to the pleas of family members and his defense team and decided to accept a plea bargain, under which he would be sentenced to life without the possibility of probation or parole for 25 years in exchange for his guilty plea.

With Lundy present at the plea hearing, the trial judge conducted a plea colloquy, during which Tigue answered "yes" when asked whether the statements contained in the plea agreement about his guilt were true; whether his plea was knowingly, intelligently, and voluntarily entered; whether he understood that he was waiving his constitutional rights, including the right to a trial by jury and the right to appeal; and whether he was satisfied with his counsel. At the conclusion of the hearing, the judge advised Tigue that if he had any questions, he could ask them when he returned for sentencing, which was delayed until February 26 to allow for completion of the presentence investigation report under KRS 532.050. At the conclusion of the plea hearing, Lundy filed with the court formal written notices of withdrawal of the motions to suppress and for psychiatric evaluation.

Soon after returning to the jail, however, Tigue called his counsel and family members to tell them that he wished to withdraw the guilty plea, which he claimed was false and involuntary. And in the weeks that followed, he made numerous unsuccessful attempts to contact his attorneys to request their assistance in withdrawing the plea. In addition, the trial judge received several letters from Tigue and members of his family asking that he be allowed to withdraw the plea and detailing various encounters, occurrences, and statements that they believed showed negligent representation and professional misconduct by defense counsel.

But defense counsel never acknowledged Tigue's requests, and no written motion to withdraw the guilty plea was filed on Tigue's behalf before the sentencing hearing

was discharged the next day with final diagnoses of adjustment disorder with depressed mood and what appears to be "possibly substance abuse" (though the handwriting is difficult to make out).

In contrast, according to members of Tigue's family, trial counsel was provided with many more medical records which purportedly documented his history of psychiatric diagnoses and treatment. They allegedly obtained the records on their own accord, purportedly in the face of complacency and neglect of counsel, and provided them specifically to use in support of the motion.

According to one letter signed by Theresa McVey (Tigue's sister) and dated February 29, 2004, this consisted of 237 pages of records from Baptist Regional's psychiatric facility mentioned above, 125 pages from Pineville Community Hospital, and 15 pages from physician, Dr. Jerry L. Woolum. For context, while the addressee's name has been redacted and the identity of that individual cannot be gleaned from the content of the letter, it appears McVey wrote it in tandem with or supplemental to complaints of professional misconduct by Hudson and Lundy that she filed with the Kentucky Bar Association on February 26, 2004.

held on February 26, 2004. At that time, Tigue orally asked to be allowed to withdraw the plea, stating that he had entered the plea involuntarily as a result of the actions of his defense team. During the exchange that followed, the judge acknowledged having received and read letters from Tigue and his family members, but stated that he would not further address the allegations they raised despite conceding that "there are things in those letters that could cause [him] concern." But in concluding that Tigue had "not given [him] any grounds to withdraw [the] plea," the judge explained, "There's been no motion to withdraw your plea. You're doing this pro se. You're not giving me really what I would consider to be sufficient legal grounds at this time."

Having thus declined to address the merits of Tigue's allegations and summarily denied the request to withdraw, the court proceeded to pronounce the final judgment, sentencing Tigue to life in prison without the possibility of probation or parole for 25 years in accordance with the terms of the plea agreement. The judge then stated, "I'll be seeing you back. I feel relatively certain about that. At some point in time, I suspect we will conduct an actual hearing into the issues that you've raised, that you wanted to raise, by the letter, by the letters that you sent." Finally, when Tigue asked how long he had to file an appeal, the judge stated:

> There's no appeal from a plea of guilty since there was no formal motion filed with the court to withdraw your plea of guilty. If I had ruled on that, ruled on an actual formal motion to withdraw your plea of guilty, that would be a final and appealable order. But there is no

appeal from this plea of guilty. But you do have other post-judgment remedies that are available to you. And like I said, I'm not going to bother to tell you what those are because I have no doubt you're going to learn. You'll learn very quickly what those are once you get to the Department of Corrections. So we'll just address them as they come up.

Tigue did not pursue a direct appeal and, as anticipated by the trial court, he instead filed a pro se motion to vacate his conviction and sentence under Criminal Rule 11.42 and a motion for appointment of counsel. Relevant to this appeal, his pro se motion challenged the validity of his guilty plea on grounds that it was the product of ineffective assistance of counsel, alleging that he had not knowingly, intelligently, and voluntarily entered his guilty plea, but rather had been coerced and manipulated into doing so by his defense team. The trial court granted the request for appointment of counsel.

On June 18, 2008, appointed counsel filed a supplemental motion and memorandum of law raising as additional grounds for relief that Tigue was denied assistance of counsel during a critical stage of the proceedings (the motion to withdraw the plea) and was denied conflict-free counsel, both of which violated his right to counsel. After holding a two-day evidentiary hearing, the trial judge issued an order on December 31, 2008, denying the 11.42 motion, finding, among other things, that Tigue had not received ineffective assistance of counsel and that he had knowingly, intelligently, and voluntarily entered his guilty plea.

Tigue appealed.[5] The Court of Appeals reversed Tigue's convictions and sentence

5. While the appeal was still pending, Tigue filed, again pro se, a motion under Civil Rule 60.02 to vacate the order denying his previous motion to vacate and to vacate the judgment of conviction. The trial court denied the motion without holding another evidentiary hearing, and Tigue timely appealed that denial as well. Because they shared common

and remanded the case for a new trial, holding that he was denied assistance of counsel at a critical stage of his criminal proceedings resulting in a *per se* violation of his right to counsel under the state and federal constitutions. Specifically, the Court of Appeals held that a motion to withdraw a guilty plea is a critical stage of criminal proceedings during which the right to counsel attaches and that trial counsel's refusal or failure to file a motion to withdraw the plea on Tigue's behalf constituted a denial of counsel. The Court of Appeals did not reach Tigue's other claims of error.

This Court granted the Commonwealth's motion for discretionary review to address whether a request to withdraw a guilty plea is a critical stage of the proceedings, and whether Tigue's right to counsel was violated. This Court also granted Tigue's cross-motion for discretionary review raising the issues left unaddressed by the Court of Appeals as alternative reasons to affirm, putting those issues before this Court as well.

## II. Analysis

This Court ultimately reverses Tigue's conviction and sentence and remands to the trial court for a possible new trial upon finding ineffective assistance of counsel leading to his guilty plea. For that reason, the Court could avoid deciding the Commonwealth's claim as it would be rendered moot. But because the Commonwealth raises a novel question, this Court has decided to answer it and describe how it would play out if Tigue were not entitled to greater relief from his other claims of error. Tigue's other claims are then ad-

dressed, to the extent necessary, to give him the full relief to which he is entitled.

### A. Tigue's request to withdraw his guilty plea

The Commonwealth claims that the Court of Appeals erred in concluding that Tigue's request to withdraw his guilty plea was a critical stage of the proceedings and, as a result, that Tigue was improperly denied the assistance of counsel at that proceeding. Alternatively, the Commonwealth argues that Tigue had sufficient assistance of counsel and, even if he did not, the only remedy available is an evidentiary hearing, not reversal of his conviction and sentence.

Whether a motion to withdraw a plea is a "critical stage" is an issue of first impression for this Court. This Court concludes that a pre-judgment proceeding at which a defendant seeks to withdraw his guilty plea is a critical stage of the proceedings at which he is entitled to the assistance of counsel. This Court also concludes that Tigue's right to counsel was violated when his counsel refused to help him seek to withdraw his plea and the trial court refused to consider his pro se request (and appoint him counsel). Finally, the Court concludes that reversal of the *conviction* in such a situation is the wrong remedy.

### 1. A request to withdraw a guilty plea is a critical stage of the criminal proceeding at which the right to counsel attaches.

█ As a preliminary matter, we must address Tigue's argument that the Com-

issues and circumstances, the Court of Appeals consolidated the two appeals for purposes of making a decision on the merits. To the extent that they differed from those raised in his 11.42 motion, the issues raised by the pro se 60.02 motion were not reached by the

Court of Appeals. Because the separate grounds for relief raised by the 60.02 motion to vacate are not germane to this Court's resolution of Tigue's appeal, we do not address them further.

monwealth cannot challenge the Court of Appeals' conclusion that a motion to withdraw a guilty plea is a critical stage of the proceedings because it did not explicitly include this exact issue in its motion for discretionary review. We must disagree with Tigue. Each of the questions of law presented by the Commonwealth in its motion for discretionary review were preceded by the conditional clause, "If a motion to withdraw a guilty plea is a critical stage of the proceedings." That is sufficient to preserve this issue for our review. Even absent such language, reaching the other issues raised by the Commonwealth necessarily requires first affirming the Court of Appeals' holding that a motion to withdraw a guilty plea is a critical stage.

■ Turning to the critical-stage question, it almost goes without saying that the Sixth Amendment, as extended to the states by the Due Process Clause of the Fourteenth Amendment, guarantees all criminal defendants the right to counsel. *See* U.S. Const. amend. VI; *Gideon v. Wainwright,* 372 U.S. 335, 342–43, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Defendants also have a right to counsel under the Kentucky Constitution. Ky. Const § 11. A criminal defendant's right to counsel "is needed to protect the fundamental right to a fair trial," *Strickland v. Washington,* 466 U.S. 668, 684, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and, therefore, entitles the accused to "assist[ance] by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair." *Id.* at 685, 104 S.Ct. 2052. "[T]he right to counsel is the right to effective assistance of counsel." *Id.* at 686, 104 S.Ct. 2052.

■ A criminal defendant has a right to assistance of counsel not only at the actual trial, but at every "critical stage" of the criminal proceedings. *E.g., Henderson v. Commonwealth,* 396 S.W.2d 313, 314 (Ky. 1965). Because Tigue claims he was denied counsel at a critical stage when his counsel would not assist him in seeking withdrawal of his plea, we must first determine whether the presentation of a pre-judgment[6] motion to withdraw a guilty plea is a critical stage of criminal proceedings. In other words, is a criminal defendant entitled to assistance of counsel to request withdrawal of a guilty plea before final judgment has been entered? For the reasons discussed below, this Court's answer is yes.

As a general matter, we note that there exists no precise and comprehensive definition of what constitutes a "critical stage." The United States Supreme Court has defined the concept in numerous ways over the years, including proceedings when "[a]vailable defenses may be irretrievably lost, if not then and there asserted," *Hamilton v. Alabama,* 368 U.S. 52, 53, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961); "where rights are preserved or lost," *White v. Maryland,* 373 U.S. 59, 60, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); when counsel's assistance is "necessary to mount a meaningful 'defence,'" *United States v. Wade,* 388 U.S. 218, 225, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); where "potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice," *id.* at 227, 87 S.Ct. 1926; and when it holds "significant consequences for the accused," *Bell v. Cone,* 535 U.S. 685, 696, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

---

**6.** Our analysis and decision in this case is limited to pre-judgment motions, leaving for another day inquiry into whether a post-judgment plea withdrawal proceeding is a critical stage.

Both the Kentucky courts and the federal courts have long recognized that both sentencing and guilty-plea proceedings are critical stages during which the right to counsel attaches. *See Mempa v. Rhay,* 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967); *Iowa v. Tovar,* 541 U.S. 77, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004); *Stone v. Commonwealth,* 217 S.W.3d 233, 239 (Ky.2007) ("[P]lea negotiations, guilty plea hearings, and sentencing hearings are all 'critical stages' at which the right to counsel attaches." (quoting *King v. Bobby,* 433 F.3d 483, 490 (6th Cir.2006))). It is axiomatic that "[a] guilty plea . . . is an event of signal significance in a court proceeding." *Florida v. Nixon,* 543 U.S. 175, 187, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004). Because a valid guilty plea forecloses the very right to a trial, it is not hyperbole to say that a defendant's guilty plea might in fact be the *most* critical stage of his criminal proceeding. *See United States v. Akins,* 276 F.3d 1141, 1147 (9th Cir.2002) ("Nowhere is counsel more important than at a plea proceeding.").

And when the validity of a plea is called into question, "a plea withdrawal hearing is vital to ensuring the integrity of the process by which guilt may ultimately be determined." *United States v. Davis,* 239 F.3d 283, 286 (2d Cir. 2001). We see little reason to distinguish the "criticalness" of procedures employed on the front end in entering the guilty plea from that of those on the back end of the plea when the validity of the plea is called into question before final sentencing. At both stages, when a defendant enters a guilty plea and when he seeks to withdraw the plea, the validity of the plea is at issue. Thus, federal courts have generally concluded that "[a] plea withdrawal hearing is a 'critical stage' in the criminal proceeding." *United States v. Sanchez–Barreto,* 93 F.3d 17, 20 (1st Cir.1996).

■ We agree and thus hold that a motion to withdraw a guilty plea made before entry of the final judgment of conviction and sentence is a "critical stage" of the criminal proceedings to which the right to counsel attaches.

**2. Tigue was denied assistance of conflict-free counsel during his motion to withdraw the guilty plea.**

■ Having determined that a motion to withdraw a guilty plea is a critical stage, we now turn to the question whether Tigue was denied assistance of counsel when he made his pro se motion to withdraw his plea. Fundamentally, this is a claim of ineffective assistance of counsel because, after all, no assistance is necessarily ineffective assistance.

■ In the vast majority of cases, to succeed on a claim of ineffectiveness of counsel, a defendant must show: (1) deficient representation by counsel, and (2) resulting prejudice to the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). But some circumstances are so inherently prejudicial that they give rise to a *per se* violation of the right to counsel without the need to prove actual prejudice. *See Wright v. Van Patten,* 552 U.S. 120, 124, 128 S.Ct. 743, 169 L.Ed.2d 583 (2008) ("[A] Sixth Amendment violation may be found 'without inquiring into counsel's actual performance or requiring the defendant to show the effect it had on the trial,' when 'circumstances [exist] that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.'" (alteration in original) (citations omitted)). In particular, the United States Supreme Court has identified circumstances where "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective as-

sistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *United States v. Cronic,* 466 U.S. 648, 659–60, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

■ Relevant to this case, prejudice may be presumed, and a *per se* Sixth Amendment violation may thus be found, when there has been a "complete denial of counsel ... at a critical stage" of the criminal proceeding, *id.* at 659, 104 S.Ct. 2039, or "when counsel is burdened by an actual conflict of interest," *Smith v. Robbins,* 528 U.S. 259, 287, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) (quoting *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052). We conclude both that Tigue suffered from a complete denial of counsel and that his counsel had an actual conflict of interest when the request to withdraw the plea was finally made.

■ As to the complete denial of counsel, the Commonwealth notes that Tigue's trial counsel was present at the sentencing hearing where he asked to withdraw his guilty plea. While it goes without saying that an attorney's actual physical absence at a critical stage constitutes denial of counsel, *e.g., Hamilton v. Alabama,* 368 U.S. 52, 55, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961), it is also true that a complete denial of counsel may occur when, despite being physically present at the critical stage, counsel is prevented from providing assistance to the accused, *see, e.g., Geders v. United States,* 425 U.S. 80, 91, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (holding a trial court's order preventing the defendant from consulting with counsel about anything during overnight recess constituted denial of counsel); *Herring v. New York,* 422 U.S. 853, 859–63, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) (holding that defense counsel being denied an opportunity to present a closing argument constituted denial of counsel). In essence, a complete denial of counsel occurs in one of two

situations: "when counsel [is] either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Cronic,* 466 U.S. at 659 n.25, 104 S.Ct. 2039.

Of course, neither of these situations is what Tigue encountered. His trial counsel was physically present, and no court order or other action barred his counsel from assisting him in moving to withdraw his guilty plea. Instead, his trial counsel, apparently believing the plea to have been in his best interest, declined to pursue the matter on Tigue's behalf.

■ But we believe that counsel's refusal to assist a client, at least in some circumstances, has the same effect—a complete denial of counsel—as counsel's physical absence or being prevented from assisting. Of course, many tactical and strategic decisions in the course of trial and appeal belong solely to counsel, *see Taylor v. Illinois,* 484 U.S. 400, 418, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) ("[T]he lawyer has—and must have—full authority to manage the conduct of the trial."), unless a defendant has invoked his right to proceed pro se (or, as allowed under Kentucky law, the right to hybrid representation). Thus, for example, a defendant is bound by his counsel's ultimately backfiring decision to try to use a surprise witness at trial, *cf. id.* at 410–11, 108 S.Ct. 646, and may not force his lawyer "to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points," *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

■ At the same time, many decisions are personal to the defendant and can only be made by him. In fact, the Supreme Court has gone so far as to say that "the accused has the *ultimate authority* to make certain fundamental decisions re-

garding the case." *Id.* These personal decisions include "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Id.*

 Just as the decision whether to enter a guilty plea is personal to the defendant, so too is the decision whether to ask to withdraw such a plea. *See United States v. Davis,* 239 F.3d 283, 286 (2d Cir.2001) ("It cannot be gainsaid that a defendant's guilty plea is the most critical stage of the proceeding as it forecloses his very right to a trial. Consequently, in the face of an allegedly involuntary plea, a plea withdrawal hearing is vital to ensuring the integrity of the process by which guilt may ultimately be determined."). Implicit in the requirement that counsel defer to the defendant's decision to enter the plea is "the requirement that counsel abide by a client's determination, after a plea of guilty has been entered, to seek its withdrawal." *State v. Barlow,* 419 N.J.Super. 527, 17 A.3d 843, 848 (App.Div.2011). The decision to seek to withdraw a guilty plea is not merely trial strategy, and cannot be made by counsel. If a defendant has entered a guilty plea and, before entry of final judgment, desires to seek to withdraw that plea, whether because it was allegedly entered in error, under duress, or other reason, he is entitled to the assistance of counsel in making such a request. *See Davis,* 239 F.3d at 286 ("Given the occasionally complex standards governing plea withdrawals ..., it would be unreasonable to expect a criminal defendant to navigate this area of law without the competent advice of counsel." (citation omitted)).

Applying this rule to the facts in this case, we agree with the Court of Appeals that Tigue was, in effect, completely denied counsel during his efforts to withdraw his plea despite Lundy's nominal presence at the sentencing hearing. Immediately after entering the guilty plea, Tigue sought his trial counsel's assistance to withdraw the plea, but his attempts to contact counsel during the three weeks between the plea and sentencing hearing went unanswered. And the video of the sentencing hearing demonstrates that Lundy merely stood to the side during the plea withdrawal discussion and did not speak a word in Tigue's favor or otherwise offer his counsel or assistance. To stand silent and refuse to act on a decision that is personal to the defendant is no different than not being present at all. It is a complete denial of counsel.

 It is no answer, as the trial court believed, that Tigue's request could not even be entertained because it was not presented in a formal, written motion. To be sure, as a general matter, we do not condone the motion practice employed here. But after reviewing the video recording of the sentencing hearing, as well as the contents of the letters sent to the court, we are satisfied that Tigue's pro se request for permission to withdraw his guilty plea constituted a valid motion.

Our Rules of Criminal Procedure do not require all requests for relief to be made in writing and filed with the court in order to be considered valid motions. Though motions should ordinarily "be in writing," that requirement is not applied to motions "made during a hearing or trial." RCr 8.14. Nor do our rules contain any specific requirements for bringing a motion to withdraw a plea of guilty in particular. *See* RCr 8.10. Rather, whether oral or written, a motion is valid if it "state[s] with particularity the grounds" supporting the party's application to the court and "set[s] forth the relief or order sought." RCr 8.14. As to the latter requirement, it should go without saying that Tigue's clear and unambiguous request to be allowed to

withdraw his guilty plea sufficiently set forth the relief being sought.

With respect to the particularity requirement, the grounds asserted by Tigue at the sentencing hearing in support of his claim that the plea was not voluntary were that he had been "threatened" and that his counsel "never showed any interest in defending [him]" (i.e., ineffective assistance). While it may be questioned whether these statements taken alone were sufficiently particular, there is no question that the particularity requirement was satisfied here when the orally asserted grounds are considered in tandem with the letters he and his family sent to the court. The letters contained quite detailed accounts of the alleged misconduct by counsel, and certainly provided fair notice of Tigue's claims for relief. *See Beecham v. Commonwealth*, 657 S.W.2d 234, 236 (Ky.1983) ("Pro se pleadings are not required to meet the standard ... applied to legal counsel" and are sufficient if they "give at least fair notice of the claim for relief."); *see also United States v. Joslin*, 434 F.2d 526 (D.C.Cir.1970) (treating letters to the court as a pro se motion to withdraw a guilty plea). Thus, Tigue's request was sufficient to constitute a motion to withdraw the guilty plea.

■ Furthermore, because Tigue's motion raised allegations that the plea was involuntary, the trial court was required to assess the validity of the plea before proceeding to sentencing and entry of final judgment. While the decision whether to grant a request to withdraw a voluntary guilty plea rests in the discretion of the trial court, "[i]f the plea was *involuntary*, the motion to withdraw it must be granted." *Rodriguez v. Commonwealth*, 87 S.W.3d 8, 10 (Ky.2002). And because determining whether a plea was voluntarily entered requires "[e]valuating the totality of the circumstances surrounding the

guilty plea [which] is an inherently factual inquiry," *Bronk v. Commonwealth*, 58 S.W.3d 482, 487 (Ky.2001), the defendant is generally entitled to an evidentiary hearing when it is alleged that the plea was entered involuntarily, *Edmonds v. Commonwealth*, 189 S.W.3d 558, 566 (Ky. 2006); *see also Williams v. Commonwealth*, 229 S.W.3d 49, 51 (Ky.2007).

■ Moreover, Tigue's trial counsel had a conflict of interest when the request to withdraw the guilty plea was finally made. Tigue's primary argument in support of his motion to withdraw his plea involved allegations that his attorneys threatened him and refused to prepare a defense to force him into entering the plea. When a "defendant ma[kes] a claim of coercion during his plea withdrawal hearing ... his accusation place[s] his attorney in the position of having to defend himself, and potentially to contradict [the defendant], in open court." *Davis*, 239 F.3d at 287. This moves beyond a generic claim of coercion and shows an actual conflict of interest. *Id.* This is so even if counsel stands mute and does not contradict the defendant. *Id.* ("Counsel's statements at the hearing did not directly contradict Davis, but neither did they support him. Defense counsel's silence at this stage of the proceedings illustrates his actual conflict."). Thus, to the extent Lundy was present at the sentencing hearing, any continued representation during the plea withdrawal motion created an actual conflict of interest adversely affecting his performance.

■ Worse still, unlike the counsel in *Davis* who said nothing in the face of his client's allegations but still had a conflict of interest, Lundy actually spoke up. In fact, the only time Lundy spoke at all when Tigue brought up his request to withdraw the plea was when he responded to a question from the judge and confirmed that he

thought the evidence against his client was "rather overwhelming" and that the recommendation to take the plea had been discussed with Tigue and his family on numerous occasions. These statements, albeit in response to the judge's questioning, weighed against and undermined Tigue's explicitly stated position. "At that point, the attorney had an actual conflict of interest: to argue in favor of his client's motion would require admitting serious ethical violations and possibly subject him to liability for malpractice; on the other hand, '[a]ny contention by counsel that defendant's allegations were not true would ... contradict his client.' " *Lopez v. Scully,* 58 F.3d 38, 41 (2d Cir.1995) (quoting *United States v. Ellison,* 798 F.2d 1102, 1107 (7th Cir.1986) (alteration and omission in original)).[7] By noting that the evidence was rather overwhelming and justifying the plea by referring to the many discussions with Tigue and his family, "the attorney put his own interests ahead of his client's by denying the truth of [Tigue's] allegations and thereby attacking his own client's credibility." *Id.* This created an actual conflict of interest. *Id;* *see also Barlow,* 17 A.3d at 848 (holding "that defendant was deprived of effective assistance of counsel as the result of counsel's undermining of defendant's assertions of innocence in connection with his application to withdraw his plea."). As discussed above, such an actual conflict of interest is a *per se* Sixth Amendment violation. *Smith,* 528 U.S. at 287, 120 S.Ct. 746.

Because Lundy refused to assist Tigue in moving to withdraw the guilty plea, he may as well not have been present. This constituted a complete denial of counsel to Tigue when he made the request to withdraw his plea. Additionally, given the nature of Tigue's claims and the fact that Lundy spoke against those claims, Lundy was "burdened by an actual conflict of interest," *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052, and Tigue was therefore "constructive[ly] deni[ed] assistance of counsel altogether," *id.* during his motion to withdraw his plea. Because we have determined that a pre-sentencing plea-withdrawal motion is a "critical stage" of the criminal proceedings, this resulted in a *per se* violation of Tigue's right to counsel under the Sixth Amendment of the United States Constitution and Section Eleven of the Kentucky Constitution. ·

**3. Tigue's remedy is the vacating of the judgment and remand for further proceedings as may be necessary, not reversal of his underlying conviction or remand for mandatory evidentiary hearing.**

▮▮▮▮ Having determined that the Court of Appeals was correct in finding a viola-

---

**7.** We recognize that this creates a dilemma for trial counsel, who can either, undermine his client's decision or agree with the client's allegation of coercion. Neither of these is a viable option. The first, as described in this opinion, creates a conflict of interest between the lawyer and the client. And the latter option is barred because "it is unethical for counsel to assert his or her own ineffectiveness for a variety of reasons." *Humphrey v. Commonwealth,* 962 S.W.2d 870, 872 (Ky. 1998). The dilemma is best solved by the trial court:

> [I]n the face of a motion to withdraw a plea based on counsel's misconduct, [trial] courts must determine whether the facts as alleged support a finding of a conflict. If they do not, there is no problem. If they do, the defendant may still waive his right to conflict-free counsel or his right to counsel altogether and proceed pro se; otherwise, the district court must provide the defendant with the effective assistance of conflict-free counsel for purposes of the plea withdrawal. Our frequent review of district courts' actions in this circuit confirms that the appointment of new counsel in such situations is the usual practice.

*United States v. Davis,* 239 F.3d 283, 287–88 (2d Cir. 2001).

tion of Tigue's right to counsel, we must now consider whether reversing the judgment of conviction and sentence and remanding for a "new trial" was the appropriate remedy in this case. As noted above, the Commonwealth claims that Tigue's remedy is limited to an evidentiary hearing on a motion to withdraw his guilty plea, and that reversal of his conviction and sentence is too drastic of a remedy. Although this Court agrees that Tigue has not yet shown entitlement to a new trial under this claim, it nevertheless concludes that the trial court's judgment of conviction and sentence entered after Tigue asked to be allowed to withdraw his guilty plea must be vacated. At the same time, however, this Court cannot, as requested by the Commonwealth, order that an evidentiary hearing take place.

■ As discussed above, the refusal of Tigue's counsel to assist him in seeking to withdraw his guilty plea functioned as a complete denial of counsel at a critical stage of the proceedings, which "is a *per se* Sixth Amendment violation." *Stone v. Commonwealth*, 217 S.W.3d 233, 238 (Ky. 2007) (quoting *Van v. Jones*, 475 F.3d 292, 311–12 (6th Cir.2007)). The remedy for such a violation, however, is not complete. reversal and remand for a new trial in every case. Although a *per se* Sixth Amendment violation is not subject to harmless-error analysis, the remedy has been described as "reversal of a conviction, a sentence, or both, *as applicable.*" *Id.* (quoting *Van*, 475 F.3d at 311–12) (emphasis added).

■ We read this as meaning that the remedy is reversal of whatever judgment or order is tainted by the lack of counsel. The lack of counsel can only have prospective effect. Thus, if there is an absence of counsel before the conviction, then the conviction is reversed. But if the absence of counsel comes after the conviction, but before sentencing, then only the sentence is vacated. In the latter scenario, there is no taint on the pre-existing conviction.

■ In this case, Tigue's complete denial of counsel occurred after his guilty plea. But "[a] plea of guilty . . . is itself a conviction. Like a verdict of a jury it is conclusive. More is not required; the court has nothing to do but give judgment and sentence." *Kercheval v. United States*, 274 U.S. 220, 223, 47 S.Ct. 582, 71 L.Ed. 1009 (1927); *see also Cook v. Commonwealth*, 129 S.W.3d 351, 364 (Ky.2004) ("The word [conviction] generally means the ascertainment of defendant's guilt by some legal mode and an adjudication that the accused is guilty. This may be accomplished by . . . a plea of guilty or a verdict which ascertains and publishes the fact of guilt." (quoting *Commonwealth v. Reynolds*, 365 S.W.2d 853, 854 (Ky.1963) (brackets in original)). Because the denial of counsel caused by Tigue's counsel's refusal to assist him in trying to withdraw his guilty plea occurred after entry of that plea, it can have no direct effect on that plea.

Instead, the denial of counsel tainted only those official decisions coming after it. These consist primarily of the "Judgment and Sentence Pursuant to Guilty Plea" entered by the trial court. Tigue's guilty plea, if not withdrawn, can still have legal effect. It is a legal conviction from which judgment can be pronounced and sentence can be imposed. Thus, to the extent that the Court of Appeals reversed Tigue's conviction and remanded for a new trial because of trial counsel's failure to assist in seeking to withdraw the plea, it erred by granting him too much relief.

The question, then, is whether the Commonwealth is correct that the proper remedy is remand for an evidentiary hearing

on Tigue's motion to withdraw his guilty plea. We cannot ignore that all of this trouble stems from Tigue's attempt to withdraw his guilty plea, which if successful would have nullified the legal effect of the plea. *See Kercheval*, 274 U.S. at 224, 47 S.Ct. 582 ("The effect of the court's order permitting the withdrawal was to adjudge that the plea of guilty be held for naught."); *Meece v. Commonwealth*, 348 S.W.3d 627, 654 (Ky.2011). Indeed, this is the remedy applied by most other courts that have found a Sixth Amendment violation in similar circumstances. These courts have remanded for appointment of counsel to help with the motion to withdraw the plea and to hold a hearing where counsel's pre-plea performance and alleged coercion would be addressed. *See, e.g., Fortson v. State*, 272 Ga. 457, 532 S.E.2d 102, 105 n.3 (2000); *Searcy v. State*, 971 So.2d 1008, 1012 (Fla. Dist. Ct.App. 2008); *State v. Obley*, 19 Neb.App. 26, 798 N.W.2d 151, 158 (2011).

But this goes too far to the extent that it *requires* a hearing on remand. The effect of this error is limited. All it requires is for this Court to rewind this matter to the point in time when Tigue had already entered his plea but before he was sentenced. A defendant in such a position *may* again seek to withdraw his guilty plea. And if he does, he is entitled to the assistance of counsel (other than the trial counsel he accuses of having acted ineffectively) and to be heard on his underlying claims. But such a defendant might not again seek to withdraw his plea. He could, for example, be enticed by the Commonwealth to leave his plea in place by a recommendation of a lesser sentence or a favorable parole recommendation.

Thus, we think mandating a hearing on remand is inappropriate. Instead, the appropriate remedy is to vacate the judgment but not, at this point, the guilty plea, and to remand for further proceedings as may be required, depending on the action of the defendant.

This is the minimum relief that Tigue is entitled to, based on the foregoing analysis. But as noted above, Tigue has raised other claims, such as his underlying claim that his counsel were ineffective because they did not adequately investigate his possible defenses and that he was coerced into entering his guilty plea. The Court of Appeals never reached these claims because it reversed Tigue's conviction and remanded for a new trial on the plea-withdrawal issue discussed above.

Those other issues are again live and no longer moot because this Court is granting lesser relief with respect to the denial of counsel at the sentencing hearing than he might receive if he is successful on his other claims. This leaves two options for this Court going forward: remand to the Court of Appeals to decide the issues left unaddressed before, or go ahead and decide the other issues to the extent necessary.

Often, remand in such a case is the better course of action. Except in direct appeals of criminal cases with sentences of twenty years or more and a few other narrow types of case, this Court is not a court of direct review. But this case is different than the average discretionary appeal where we disagree with the Court of Appeals but have issues still to be resolved. Here, we are disagreeing only as to the degree of relief the defendant is entitled to. Tigue's other claims, if successful, would entitle him to greater relief—reversal of his conviction (the guilty plea) and remand for a new trial—than this Court is granting on the issue actually addressed by the Court of Appeals. If we remand for consideration of the other issues, we create the danger of seemingly inconsistent results, since we would have

reversed only the trial court's judgment and left intact the guilty plea, whereas a Court of Appeals ruling in Tigue's favor would vacate the guilty plea. Moreover, the full case with all its issues is already at this Court, discretionary review having been granted to both sides, and judicial economy favors swift resolution of the full appeal. For those reasons, we will go ahead and address Tigue's other claims to the extent necessary.

**B. Tigue received ineffective assistance of counsel that led to his entering a plea of guilty.**

Tigue's primary other claim, and the only one that must be addressed, is that his trial counsel were ineffective because they failed to investigate the charges against him and possible defenses he might raise. He claims that this conduct, really omissions, along with pressure from his counsel led him to enter his guilty plea.[8]

■ As noted above, to succeed in a standard claim of ineffectiveness of counsel, a defendant must show (1) deficient representation by counsel and (2) resulting prejudice to the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This "test applies to challenges to guilty pleas based on ineffective assistance of counsel." *Hill v. Lockhart*, 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). *Hill* noted that

"[i]n the context of guilty pleas, the first half of the *Strickland v. Washington* test is nothing more than a restatement of the standard of attorney competence already set forth in *Tollett v. Henderson,* [411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973) ], and *McMann v. Richardson,* [397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) ]." *Hill,* 474 U.S. at 58–59, 106 S.Ct. 366. Under those cases, the voluntariness of the plea depends on whether counsel's advice "was within the range of competence demanded of attorneys in criminal cases," *McMann,* 397 U.S. at 771, 90 S.Ct. 1441, and a defendant who pleads guilty upon the advice of counsel "may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann,*" *Tollett,* 411 U.S. at 267, 93 S.Ct. 1602.

■ The prejudice prong, when addressing guilty pleas, "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill,* 474 U.S. at 59, 106 S.Ct. 366. "In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.*

The Court further elucidated that "[i]n many guilty plea cases, the 'prejudice' in-

---

8. It is worth noting that this claim differs from the claim that Tigue might be able to raise at the trial court if this matter were remanded there only on the plea-withdrawal issue addressed above, although both claims would stem from the same underlying facts—counsel's pre-plea conduct. The claim he would be able to raise on remand to the trial court as laid out above would be a direct claim that his plea was invalid because it was unknowing and involuntary. The claim addressed here is an indirect claim, namely, that his counsel were ineffective in pre-trial inves-

tigation, which in turn led him to enter a plea that he would not otherwise have entered. This is a subtle distinction, but it is one we have maintained in our law, if only recently. *See Leonard v. Commonwealth,* 279 S.W.3d 151, 158 (Ky.2009) (distinguishing between direct claims of error and indirect or collateral claims of ineffective assistance of counsel, even when the claims are related). Part of the reason for the distinction is that different standards of review govern the two types of claims. *Id.*

quiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial." *Id.* In addressing a scenario like Tigue's, "where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence," *id.* the Court stated that "whether the error ... caus[ed] him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea," *id.* and that "[t]his assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial," *id.* The Court also addressed the failure to advise the defendant about potential defenses, like the possible alternative-perpetrator claim in this case, stating "the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Id.* In other words, "to obtain relief [on an ineffective assistance claim] a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Stiger v. Commonwealth*, 381 S.W.3d 230, 237 (Ky.2012) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 372, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010)) (alteration in original).

Turning to the facts of this case, it is worth noting that the trial judge, though ultimately denying the claim, stated: "This case raises some troubling issues, it just flat out does.... Because I know I sat right here and watched it all, and I had a strong sense that Mr. Tigue was not being well attended by his attorneys." And Tigue testified that the "straw that broke the camel's back" was Lundy telling him in the hallway of the courthouse the morning of his plea hearing that he "wasn't going to put up a defense if [Tigue] took it to trial." Nevertheless, the trial court denied the 11.42 motion, concluding that defense counsel acted reasonably in its investigation, or lack of investigation, of the charges against Tigue (specifically, in not investigating Danny Smith's purported role in the murder).[9] The court found that defense counsel had been faced "with a client who had confessed to murder ..., a client who was uncooperative and untruthful with his own attorneys, and a client against whom the other evidence of guilt was overwhelming." The trial court further concluded that Tigue had not satisfied the prejudice prong of *Strickland,* finding that the evidence which could have been discovered through investigation by defense counsel would not have "affected [Tigue]'s trial in any way." Finally, the trial court concluded that the plea was knowingly, voluntarily, and intelligently entered. In so ruling, the judge relied upon his recollection and review of the plea colloquy, his findings that Tigue possessed above-average intelligence and had previous experience in the guilty plea process,[10] and his rejection of Tigue's claim that his defense team had coerced and manipulated him into pleading guilty.

---

9. A statement by the judge at the conclusion of the August 6, 2008, hearing helps illuminate his reasoning behind finding reasonable performance by defense counsel. Specifically, after noting his concern "that Mr. Tigue was *not being well attended by his attorneys,"* the judge said:

> But they also have reasons too. They get some cases that they see as mission impossible, and I think that was the situation here, Mr. Tigue. That's why you didn't see a whole lot of trial preparation here because the last thing they wanted to do was take your case to trial.

10. Tigue pleaded guilty to an unrelated burglary charge in 1999.

First, we find no abuse of discretion to the extent the trial court found Tigue had not shown his defense team's pressure tactics employed to convince him to accept the plea, at least standing alone, constituted traditional coercion that rendered his plea involuntary. No unfilled promises were made to Tigue, nor was he truly threatened with physical harm or otherwise under such duress to have overborne his will in deciding to plead. *See Brady v. United States*, 397 U.S. 742, 750, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *Adams v. Tuggle*, 300 Ky. 751, 189 S.W.2d 601 (1945). That said, the pressure tactics used to convince Tigue to plead guilty are nevertheless relevant to our assessment of the totality of the circumstances surrounding the plea as we evaluate whether defense counsel's pre-trial performance was deficient so as to render the guilty plea invalid.

In addition to alleging coercion, Tigue further claims that counsel's failure to adequately investigate the charges against him—in particular, the failure to investigate Danny Smith's alleged role in Bertha Bradshaw's murder—and prepare for the guilt phase of his trial was ineffective assistance rendering his guilty plea invalid.[11] And Tigue points to several pieces of evidence to support his claim that his trial counsel's deficient investigation and preparation for trial rendered his plea invalid.

Most notable was the testimony of Charles Griffin, who was one of Bradshaw's neighbors. In particular, Griffin testified at the 11.42 hearing that he heard a gunshot in the direction of the Bradshaw residence on the morning her body was discovered (by Griffin's wife). He heard the gunshot approximately two hours before the time that another neighbor witnessed Tigue's truck parked in the driveway. And he testified that he saw an individual he recognized as Danny Smith standing on the Bradshaws' property only a couple minutes after hearing the gunshot. When questioned about his failure to provide this information to police, Griffin explained that he initially failed to tell police what he had seen because he had been focused on the mental and emotional state of his wife after she had discovered Bradshaw's body, and that later he had not seen any reason to provide this information to the police because he had heard that Tigue confessed. Nobody from Tigue's defense team had interviewed Griffin (or, to his knowledge, any of his neighbors) during the *ten months* Tigue was in jail before pleading guilty. Griffin's testimony was first brought to light during the 11.42 evidentiary hearing in 2008.

Tigue also emphasizes his counsel's recommendation to enter the guilty plea before the forensic lab testing of evidence found in the Bradshaw residence was completed. Of particular significance are clothing fibers found in the splintered wood of the broken kitchen door, which were believed to have come from the flannel shirt Tigue had been wearing when he broke into the house the morning of the murder. The lab results proved, however,

11. As noted above, Tigue's allegations essentially amount to a claim of ineffective assistance of counsel, i.e., that counsel's allegedly deficient performance rendered the plea involuntary and invalid. The trial court, however, treated as standalone issues and conducted separate and distinct inquiries into the effectiveness of counsel, the alleged coercion by counsel, and the validity of the plea. But since Tigue alleged that defense counsel's ineffectiveness in failing to investigate and prepare a defense for trial, in addition to coercion, caused his involuntary decision to plead guilty, the court should have evaluated the effectiveness of counsel's performance as part of the totality of the circumstances surrounding the allegedly involuntary plea.

that Tigue's shirt was not the source of these fibers, thus supporting his claim that someone else (possibly Danny Smith) had actually broken into the house and killed Bertha Bradshaw before Tigue burglarized the house. And other evidence found at the scene, such as various human hairs, ultimately proved to be inconclusive and thus were at least not inculpatory.

Not only did Tigue's trial counsel fail to ever obtain the lab results, they clearly believed that this evidence would harm Tigue. Thus, at the 11.42 hearing, in explaining their pre-plea conduct to not investigate and to urge a guilty plea, they claimed that all the evidence was against him. Yet the lab results were only discovered by Tigue's appellate counsel after the 11.42 hearing (and were presented as one of the grounds for relief in the Civil Rule 60.02 motion that was later added to the appeal).

 While the duty to investigate is not absolute, a less-than-complete investigation may be supported only by a reasoned and deliberate determination that further investigation is not warranted. "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052. And to be sure, a reasonable investigation need not be "an investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources, but also with the benefit of hindsight, would conduct," but rather "must be reasonable under all the circumstances." *Haight v. Commonwealth*, 41 S.W.3d 436, 446 (Ky.2001), *overruled on other grounds by Leonard v. Commonwealth*, 279 S.W.3d 151 (Ky.2009).

With this in mind, our review of the record makes clear that Tigue's counsel's investigation was deficient. Informing our decision here is *Bowling v. Commonwealth*, 981 S.W.2d 545 (Ky.1998), the facts of which were similar to yet readily distinguishable from this case. The Court in *Bowling* rejected several claims of ineffective assistance of counsel, including that trial counsel was ineffective for failing to investigate several other people who allegedly had a motive to commit the charged murders. The Court held that the alleged failure to investigate did not constitute ineffective assistance because the argument was based only on "vague rumors and unsupported claims," *id.* at 550, and, in any event, "the mere existence of other potential suspects could do nothing to diminish the impact of the Commonwealth's overwhelming proof against Appellant," *id.*

The Court added that the claim was "particularly offensive when Appellant allege[d] to know the identity of the actual killer yet continue[d] to withhold the information." *Id.* In addition, the Court in *Bowling* also found no ineffective assistance of counsel in failing to locate a witness to the shooting who had provided a description of the shooter that did not match the defendant's appearance because the claim was refuted by the record, which demonstrated that defense counsel had in fact "made extraordinary efforts to locate [the witness], and even requested a continuance until he could be found." *Id.*

The facts here differ from those in *Bowling* in several respects. First, Tigue claims that his counsel was ineffective in failing to investigate, in particular, Danny Smith's involvement in the murder, rather than some unidentified other person or people who *might* have had a motive to kill Bertha Bradshaw. And while Hudson testified that Tigue never specifically identified Smith as the true killer to her (and

had been otherwise uncooperative),[12] she admitted to having been aware of the fact that he had initially told police that Smith had murdered Bradshaw. So even assuming Tigue had refused to name the alleged killer while also maintaining his innocence and claiming someone else did it, the reasonable inference based on even cursory investigation would be that Smith was that person.

■ And the reasonable course would have been to investigate his potential role in the murder. "[A]n attorney cannot ignore the duty to make a reasonable investigation merely because his or her client is uncooperative or mislead[ing]." *Slaughter v. Parker*, 187 F.Supp.2d 755, 836 (W.D.Ky.2001), *aff'd in part, rev'd in part on other grounds*, 450 F.3d 224 (6th Cir. 2006).

But as Lowell Lundy and Cotha Hudson readily admitted, they chose not to investigate Tigue's claims of innocence whatsoever because they believed his confession was true despite his assertions to the contrary. Moreover, it was even conceded that, at the time the guilty plea was entered, defense counsel had made no cognizable preparations for the guilt phase of the trial, despite having had almost ten months to do so.

Indeed, when asked if he had ever discussed with Tigue their plans for trial, Lundy replied, "There weren't any plans for trial except to let him take the stand and testify if he wanted to." And in response to a later question about investigative measures taken to prepare for the guilt phase, he could not recall having conducted *any* investigation outside of

speaking with Tigue and his mother. Furthermore, although Lundy filed what he described as a "universal motion to suppress all evidence against [Tigue]" on January 12, 2004, the record demonstrates that it was withdrawn only two weeks later on January 27. But when asked about it, Lundy could not say whether he had ever discussed the possibility of suppression with Tigue or not. Similarly, Lundy could not recall the filing or withdrawal of the motion for psychological evaluation, nor could he remember ever discussing with Tigue or his family members Tigue's mental or emotional state or the possibility of having him undergo an evaluation. And Lundy testified that he was not aware that Tigue had any history of mental illness, adding, "He may have been in an asylum. If he was, I don't know it. He may have told me but I don't recall it."

On the other hand, Hudson could recall having interviewed one witness, the neighbor who placed Tigue's truck at the scene. She also testified that she and Lundy had investigated Tigue's medical and educational history for mitigation purposes. She confirmed that the first time she spoke with Tigue, he told her he had not killed Bradshaw but would not tell her who had. And she acknowledged that this was consistent with his initial statements to police identifying Danny Smith as the murderer. But Hudson admitted that she had never tried to corroborate Tigue's version of events "since he wouldn't provide us any information" and "was uncooperative and was sticking to the fact that he had lied to police." Moreover, she testified that, on the date Tigue had entered his guilty plea,

12. The trial court found that Tigue had not cooperated with his defense team based, at least in part, on Hudson's testimony. But there was conflicting testimony on this point. In particular, Tigue testified that he had provided Smith's name to his attorneys and de-

fense team, but had been rebuffed because he had already confessed. And, in fact, some of Hudson's own testimony implies she was at least aware of Smith's potential connection to the murder.

she had been in a different county for another case and while there, coincidentally enough, had begun "outlining what [they] would be doing for final prep for trial." According to Hudson, she "was going to look into Danny Smith" but "hadn't gotten that far into the case when [they] settled." And not unlike the testimony of her co-counsel, Hudson could not remember their reason for withdrawing the motion for psychiatric evaluation, adding, "I believe he asked me to withdraw it."

Finally, we find additional convincing proof of the deficiency of counsel's pre-trial performance in the answers provided by Hudson to a form filled out in conjunction with the Kentucky DPA Capital Litigation Persuasion Institute's training workshop she attended in October 2003 in preparation for Tigue's trial.[13] Hudson's disdain for Tigue and his family is apparent in her answers on this form, with her going so far as to state, "I hate my client." [14] Also clear is her steadfast refusal to acknowledge his claims of innocence or possible weaknesses in the Commonwealth's evidence that might in fact have supported such claims.[15]

The clear implication of Hudson's responses and non-responses is that she had no intention of making any significant investigation or preparation for the guilt phase of the trial. For example, the form asked about the "most important motions or evidentiary hearing or presentation issue you have" in the case. Her answer: "suppression of evidence." We are strained to read anything but neglect in this answer given the obvious questions in this case about a likely other suspect, or alleged alternative perpetrator. More importantly, even though suppression of evidence was listed as the most important issue, Hudson and Lundy did not follow through on it.

As noted above, a motion to suppress Tigue's confession and other evidence was eventually filed on January 12, 2004. But it is obvious from the record that Lundy did so reluctantly and only as a token concession to the dogged insistence of Tigue and his family. The motion was never argued or otherwise addressed before being withdrawn by Lundy only two weeks later. In any event, Hudson testified that she did not even remember the motion to suppress. We can think of few examples better encapsulating deficient pre-trial performance than determining that an issue is the most important one in a case, and then totally failing to pursue it.

█ In sum, defense counsel was prepared only to concede guilt and pursue their sole goal of avoiding a death sentence.[16] And although brokering a plea

---

**13.** The form was signed by Hudson and dated September 29, 2003.

**14.** For example, question five asked Hudson to list the three "most SIGNIFICANT PROBLEMS with [her] case, from problems inside and outside courtroom, legal, factual, strategy personalities in case, etc.," to which she answered, listing only two:

　　1) "his family"
　　2) "himself"

The seventeenth question asked Hudson to list "[t]he strongest emotion [she] ha[d] about this case," to which she responded, "I hate my client."

**15.** For example, the ninth question asked her to list the three "most difficult areas [she was] experiencing with [her] client." She answered:

　　1) "his denial"
　　2) "his lack of remorse"
　　3) "his inability to get serious"

Question ten asked her to list "[t]he hardest aspect of this case," which she said was "overcoming [her] anger at the stupidity of this."

**16.** And even as early as September 29, 2003, defense counsel had only one final obstacle to overcome to achieve that goal, as illustrated by questions eleven and twenty-two:

deal to avoid a possible death sentence is certainly a reasonable strategy for a capital defense lawyer, it is unreasonable to do so while disregarding counsel's duty to investigate and prepare for trial. *See Quarles v. Commonwealth*, 456 S.W.2d 693, 694 (Ky.1970) ("[A]n attorney may, *after making an adequate investigation*, in good faith and in the exercise of reasonable judgment, advise his client to plead guilty." (emphasis added)). And Tigue's counsel's outright refusal to consider pursuing any strategic goal other than avoidance of a possible death sentence through pleading guilty ran afoul of their "duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy." *Florida v. Nixon*, 543 U.S. 175, 187, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004) (citing *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052).

To be sure, this Court fully appreciates the high degree of deference with which we must scrutinize counsel's performance. *See Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. We nevertheless conclude that Tigue has "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). When Tigue repeatedly asserted an alternative perpetrator theory explaining his alleged false confession that was at least plausible, and had already disclosed the identity of this person, albeit to police and not his counsel, his attorneys made an unreasonable decision not to investigate or otherwise attempt to verify the assertions based solely on their personal beliefs as to his guilt. In other words, it was objectively unreasonable for defense counsel in these circumstances to summarily concede their client's guilt and dismiss out of hand his claim of innocence without making any effort to investigate the legitimacy of that claim. Simply put, it is clear that defense counsel's failure to investigate "resulted from inattention, not reasoned strategic judgment." *Wiggins v. Smith*, 539 U.S. 510, 526, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

We therefore conclude that counsel's pre-trial performance was so deficient as to fall outside the range of professionally competent assistance. To hold otherwise would effectively sanction otherwise deficient and incompetent performance by trial counsel any time they take the prosecution's "overwhelming" evidence—consisting of a questionable confession and then-untested, ultimately not inculpatory forensic evidence—at face value without any sort of adversarial testing. We cannot allow the presumption of innocence enjoyed by all accused to be so unceremoniously tossed aside by the very individuals tasked with zealously defending that presumption.

■■■■ But that does not end our inquiry. We must next determine whether prejudice resulted from counsel's deficient performance. And as we noted above, since this ineffective-assistance claim pertains to the validity of the guilty plea, the prejudice component of *Strickland* is satisfied if it is reasonably probable that Tigue would not have changed his plea to guilty, and instead would have insisted on going to trial, but for his counsel's failure to investigate and prepare for the guilt phase of his trial. *E.g., Bronk v. Commonwealth*, 58 S.W.3d 482, 486–87 (Ky.2001).

---

11. What is your strategy to negotiate to a life sentence:
"we already have that offer"
. . .
22. Negotiation

. . .
B. Who most needs to be persuaded to achieve a negotiated plea?
"*client*"
(Emphasis in original.)

This requires "convinc[ing] the court that a decision to reject the plea bargain would have been rational under the circumstances." *Stiger v. Commonwealth,* 381 S.W.3d 230, 237 (Ky.2012) (quoting *Padilla v. Kentucky,* 559 U.S. 356, 372, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010)) (alteration in original). As also noted above, this inquiry will often closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial.

Here, the record is replete with evidence from Tigue himself that he would not have pleaded guilty were it not for his counsel's unreasonable performance. Specifically, it is undisputed that for ten months he obstinately refused to agree to plead guilty, desiring instead to have his guilt or innocence determined at a jury trial, where he believed "the truth would come out."

It is also undisputed that he remained resolute in his resolve up until the morning of February 2, 2004. Even Hudson testified that she had completely expected to go to trial and that she was "shocked" to hear that Tigue had entered the guilty plea. That morning, after sitting in a holding cell at the courthouse for two hours, he eventually succumbed to the heavy-handed efforts of his defense team, who used members of his family as proxies. These efforts were employed for the exact purpose of overcoming his resistance.[17] And such pressure tactics would have been of doubtful efficacy if not for his counsel's clear failure to investigate and prepare for the guilt phase of trial. In fact, as we previously noted, the "straw that broke the camel's back," according to Tigue, was Lundy telling him in the hallway of the courthouse the morning of his

plea hearing that he "wasn't going to put up a defense if [Tigue] took it to trial."

Even assuming Tigue was never expressly told that no investigations or other preparations for trial had been or would be undertaken on his behalf, his attorneys' testimony effectively corroborated this sentiment when they conceded that, at the time he entered his guilty plea, they had not had any strategy for trial except to let him take the stand and tell the jury his story.

That fact clearly was not lost on Tigue or his family, all of whom testified that defense counsel's refusal to investigate and prepare any kind of defense against the charges was their primary, if not only, motivation for assisting in convincing him to plead guilty.

And we cannot say that it would not have been rational for Tigue to insist on going to trial but for his counsel's deficient performance. The evidence he managed to uncover with the assistance of appellate counsel and present at the 11.42 hearing years later makes clear that Tigue certainly had a feasible defense to the murder of Bertha Bradshaw, a defense that his attorneys' ineffective assistance wholly prevented him from developing. And after actually having an opportunity to do so, the decision not to plead guilty and instead insist on going to trial would have been a rational one for Tigue. Thus, because we can say with reasonable certainty that, but for counsel's deficient performance, Tigue would have insisted on going to trial, this Court is convinced that Tigue has satisfied the prejudice prong of *Strickland.*

Accordingly, we must conclude that the trial court erred in denying Tigue's 11.42

---

**17.** According to Tigue, at one point he requested that he be taken back to the jail to end their efforts at convincing him to change his mind. His request was reportedly refused, however, with the bailiff explaining that the driver ("Jimmy") had left the courthouse.

motion and "acted erroneously in denying that appellant's pleas were made involuntarily." *Bronk,* 58 S.W.3d at 487. The totality of the circumstances clearly demonstrates that defense counsel's performance was deficient in unreasonably failing to investigate and prepare for the guilt phase of trial, and that Tigue would not have decided to plead guilty but for counsel's deficient performance. Because counsel's ineffective assistance deprived him of a fair trial and "resulted [in] a breakdown in the adversary process that renders the [conviction and sentence] unreliable," *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052, the trial court's refusal to vacate Tigue's conviction was error.

### III. Conclusion

For the foregoing reasons, the judgment of the Court of Appeals, which reversed Tigue's conviction and sentence and remanded for a new trial, is affirmed. As a result, Tigue's convictions and guilty plea are vacated, and this matter is remanded to the Bell Circuit Court for further proceedings as may be necessary.

All sitting. All concur.