RENDERED: APRIL 30, 2020
TO BE PUBLISHED



# Supreme Court of Kentucky

2018-SC-000656-MR

STEVEN DALE EVERSOLE      APPELLANT

         ON APPEAL FROM LAUREL CIRCUIT COURT
V.          HONORABLE MICHAEL O. CAPERTON, JUDGE
         NO. 18-CR-00146

COMMONWEALTH OF KENTUCKY      APPELLEE

**OPINION OF THE COURT BY JUSTICE WRIGHT**

**REVERSING, VACATING, AND REMANDING**

A Laurel Circuit Court jury found Appellant, Steven Dale Eversole, guilty of first-degree fleeing or evading, first-degree wanton endangerment, reckless driving, and being a first-degree PFO. The trial court sentenced him to twenty years' imprisonment in accordance with the jury's recommendation.[1] He appeals to this Court as a matter of right, Ky. Const. §110(2)(b). Eversole raises five issues on appeal, alleging the trial court erred by: (1) depriving him of counsel at a critical stage of trial, (2) failing to grant his motions for directed verdict, (3) denying him a unanimous verdict, (4) admitting evidence of uncharged prior bad acts, and (5) providing the jury with improper penalty-

---

[1] The jury recommended sentences of three years for first-degree wanton endangerment and four years for first-degree fleeing or evading, enhanced to twenty years by the PFO. The jury also recommended a $100 fine for reckless driving.

phase jury instructions. Agreeing with Eversole that the trial court erred in depriving him of the right to be represented during a critical stage of the trial, we reverse his conviction, vacate the corresponding sentence, and remand for further proceedings consistent with this opinion. We address his remaining arguments only insofar as they concern motions for directed verdict.[2]

## I. BACKGROUND

Sergeant John Inman and Deputy Shannon Jones from the Laurel County Sheriff's Office were investigating the theft of a Cadillac Escalade on January 26, 2018. They had received a call from the vehicle's owner indicating the vehicle's GM OnStar™ had pinged at a remote location in a rural part of Laurel County—a field near the end of Lockaby Lane, a single-lane, narrow country road that ended in a one-lane gravel driveway. At midnight, Sergeant Inman arrived in his police cruiser where the blacktop ended, and the gravel driveway began. Deputy Jones was in his cruiser some distance behind Sergeant Inman on Lockaby Lane.

Sergeant Inman saw a white pickup truck on the gravel driveway slowly approach him and he turned his emergency lights on and off to make sure the driver of the white pickup truck knew he was there and to identify himself as an officer. Sergeant Inman pulled his vehicle slightly off the one-lane road, so the pickup truck could pull up beside him. Both vehicles had their headlights on and for a few seconds were window-to-window. Sergeant Inman got a look

---

[2] Errors concerning motions for directed verdict have double jeopardy implications if the motions should have been granted. *See Mayes v. Commonwealth*, 2014-SC-000714-MR, 2016 WL 4488308, at *2 (Ky. Aug. 25, 2016). Therefore, we must address those alleged errors.

at the driver when he said "hey" to the driver of the white truck in an attempt to get him to stop. Sergeant Inman assumed the driver was the owner of the property and was attempting to ask him where the Escalade may be in the field. However, in spite of Inman's attempts, the pickup did not stop moving. Once past Sergeant Inman's vehicle, the truck took off at a high rate of speed for the conditions of the one-lane road. By the time Sergeant Inman turned his vehicle around and gave chase, the white pickup truck was out of sight.

Sergeant Inman radioed Deputy Jones informing him the white pickup truck was headed in his direction. Lockaby Lane was a single-lane road and the white pickup truck rapidly reached Deputy Jones's location. As soon as the deputy saw the truck, he activated his emergency lights. Deputy Jones saw the truck crest a hill, accelerate, and continue down the road straight toward his cruiser. Deputy Jones said the white pickup truck never slowed down. To avoid a head-on collision, Deputy Jones drove his vehicle almost completely off the road and into a ditch. The truck left the scene and the driver was not apprehended that night.

Several days later, the Laurel County Sheriff's Office got a tip that Eversole would be at a truck stop in northern Laurel County. Eversole was arrested on a separate charge and a deputy at the scene sent a picture to Sergeant Inman, who positively identified Eversole as the driver of the white pickup truck from Lockaby Lane. Eversole was never charged with any offenses concerning the stolen Escalade.

At trial, both Sergeant Inman and Deputy Jones testified. Eversole testified in his own defense. Prior to Eversole taking the stand, a bailiff

informed the trial court a juror needed to speak with the judge. Outside the presence of the jury and with counsel in the courtroom, but not at the bench where the discussion was taking place, the juror advised the trial court that an older man approached her and offered her $50 to change her "jury selection." The juror said the man did not indicate if he wanted her to vote guilty or not guilty—or even the name of the case in which he was interested. The trial judge thanked the juror for letting him know, sent her to her seat in the jury box, and resumed the trial. Eversole was not in the courtroom when the exchange occurred at the bench between the judge and the juror. No follow-up concerning what the juror reported appears in the record, and no objections or further inquiries were made.

Eversole moved for a directed verdict at the close of the Commonwealth's case and the close of all evidence. The trial court overruled those motions. The court instructed the jury and guilty verdicts were returned on all charges. The court conducted a joint PFO/penalty phase. The jury found Eversole to be a first-degree PFO and recommended a twenty-year sentence after the PFO enhancement.

Additional facts will be developed as necessary.

## II. ANALYSIS

### A. Ex Parte Conversation with Juror

Eversole claims the trial court erred when it conducted an ex parte interview with a juror outside his presence. During a lunch break, the juror in question had spoken with the bailiff and, off the record, the bailiff advised the trial judge that the juror needed to speak with him. While counsel was present

in the courtroom and some of the jurors were beginning to return to the jury box, Eversole was not yet present in the courtroom when the trial judge asked the juror in question to approach the bench. The trial court did not ask counsel to approach the bench for the conversation. Eversole's attorney and the attorney for the Commonwealth remained seated at their respective tables. There is no indication the attorneys overheard what the juror said or sought to approach the bench to be included in the interview. The trial court did not call the attorneys to the bench after speaking with the juror to discuss the contents of the discussion. There is no indication in the record of what action, if any, the trial court took regarding the information from the juror.

Juror 262 and the trial court engaged in the following exchange at the bench:

| Judge: | You are juror number? |
|---|---|
| Juror: | 262. |
| Judge | 262. And I understand, from the bailiff, that someone approached you in the parking lot and was on the sidewalk? |
| Juror: | Yes. |
| Judge: | Where about on the side? |
| Juror: | About halfway down. I had parked on the bottom and I went halfway down. And he walked past and offered me $50 to change my jury selection. |
| Judge: | To change your jury vote? |
| Juror: | (nods) He didn't say guilty or not guilty or anything like that. Didn't mention no names. |
| Judge: | Okay. Can you describe him? |

| Juror: | He's an older gentleman, had gray hair, gray beard. I can remember he had a hat and he had on an orange shirt. |
|---|---|
| Judge: | Orange shirt. How long a gray beard would he have had? Was it a long beard? |
| Juror: | About here (motions from chin to shirt collar). |
| Judge: | About a six-inch beard. Any other identifying marks? |
| Juror: | I can't remember if he had a tattoo or not. |
| Judge: | Okay. We appreciate you reporting that and your juror number again is? |
| Juror: | 262. |
| Judge: | 262. Thank you very much. You did exactly what you're supposed to do. |

Shortly after this bench conference ended, Eversole entered the courtroom from the side door behind counsel table and sat next to his attorney. Trial resumed and Eversole was called to the witness stand on his own behalf. Prior to the jury's deliberations, one juror was randomly selected as an alternate and excused. Juror 262 remained on the panel that deliberated and decided the case. There was no admonition directing the juror not to discuss the events in question with her fellow jurors and she was not directed that what happened outside the courtroom should not be part of the jury's deliberations.

We carefully searched the record for further discussions about this conversation between the judge and juror, actions taken in response to this conversation, or even a further mention of it, but there is nothing else in the record regarding the ex parte communication between Juror 262 and the trial court. The above transcript is the entirety of what is contained in the record on

appeal related to this issue. Eversole filed no post-conviction motions for judgment notwithstanding the verdict or for a new trial. From all indications, it appears that the conversation between the judge and the juror came to light only during the appellate process (likely when appellate defense counsel watched the video recording of the trial).

The video record reveals references to three in-chamber conferences that occurred after the conversation with the juror. These conferences between the trial court and counsel concerned jury instructions and were not recorded or otherwise made part of the record. If during any of the three in-chambers discussions, the trial court told the attorneys what the juror said, there is no indication of that in the record.

Eversole acknowledges that this claim of error is unpreserved by contemporaneous objection. However, it is clear from the record that the Commonwealth, defense counsel, and Eversole were never made aware of the information provided by the juror. Without that information, we would not expect to find a timely objection in the record, as Eversole (who was out of the courtroom at the time) and his counsel (who was present in the courtroom, but not included in the bench conference with the juror) had no reason to know the discussion even involved Eversole's case. As far as Eversole and his counsel knew, the juror could have been discussing a personal issue with the judge which may interfere with the trial schedule for the next day.

Eversole was not afforded the opportunity to question the juror to determine whether her interaction with the man in the parking lot had biased her for or against either party. Neither party raised or briefed that issue, but

the possibility of juror bias tainting this trial compels our attention. An impartial jury, free of bias, is critical to a fair trial.

The Sixth Amendment to the Constitution of the United States and Sections Seven and Eleven of the Constitution of the Commonwealth of Kentucky guarantee the right to an impartial jury. Structural error occurs when that right is denied. *Hayes v. Commonwealth*, 175 S.W.3d 574, 586 (Ky. 2005). A denial of an impartial jury would not be subject to harmless error analysis because that would not be appropriate where a substantial right such as this is involved. *Shane v. Commonwealth*, 243 S.W.3d 336, 341 (Ky. 2007) ("Harmless error analysis is simply not appropriate where a substantial right is involved and is indeed logically best suited to the effect of evidence on a verdict, though some procedural errors may also be reviewed in this light.") "[T]he defining feature of a structural error is that it 'affect[s] the framework within which the trial proceeds,' rather than being 'simply an error in the trial process itself.'" *Commonwealth v. Douglas*, 553 S.W.3d 795, 799-800 (Ky. 2018). Failing to remove a biased juror taints the entire trial. *Id.* at 800. Here, Eversole was denied the opportunity to determine whether the juror was biased as he was neither present nor represented at that critical stage of the trial.[3]

The trial court had clear indications that what the juror needed to speak to the court about was more than a run-of-the-mill problem with scheduling or a sudden inability of a family member to pick up a child after school. Based on

---

[3] We need not determine whether Eversole's actual presence would have been necessary in this case. Here, he was neither personally present in the courtroom nor represented by counsel at the bench conference involving the juror. We will address this as a deprivation of counsel.

what a court bailiff told the trial judge off the record, the judge had a strong indication that this juror had something important to tell him. There was no reason for the trial court to undertake an ex parte conversation with this juror without counsel's presence.

If the information from this juror turned out to be inconsequential, time would not have been wasted having counsel present. However, if what the juror had to say turned out to be relevant to the case—as it was here—then the trial court and counsel could have handled it at the bench conference. Regardless of whether the information ultimately proved insignificant, based on what it appeared the bailiff related to the trial court, counsel should have been included in the conversation from the outset. "When an *ex parte* communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties." *Rushen v. Spain*, 104 S. Ct. 453, 456 (1983).

The trial court's failure to take action to include counsel in the colloquy or provide an admonition to the juror was improper. The juror described being offered a *bribe*. This was not an ordinary occurrence. Counsel's presence in the courtroom, without knowledge of what was being disclosed during the bench conference, was insufficient to protect Eversole's right to a fair trial—as guaranteed by his rights to representation and right to be present at all critical stages of trial. "While it goes without saying that an attorney's actual physical absence at a critical stage constitutes denial of counsel, it is also true that a complete denial of counsel may occur when, despite being physically present at the critical stage, counsel is prevented from providing assistance to the

accused." *Commonwealth v. Tigue*, 459 S.W.3d 372, 385 (Ky. 2015). The result of the trial court's failure to include counsel in the conversation with the juror effectively denied Eversole of his Sixth Amendment right to assistance of counsel.

Because she was denied access to critical information about what the juror said, Eversole's counsel could not seek to further question the juror, to remove the juror by having her selected as the alternate or to have the juror admonished. Instead, Juror 262 remained on the panel that deliberated, found Eversole guilty, and recommended the maximum possible sentence. The trial court's actions—or, rather, inactions—were unsupported by sound legal principles.

The improper conversation in the parking lot in which an unknown man offered the juror a bribe was not a simple inadvertent "hello" outside the courthouse during a lunch break. Asking the juror to change her vote in exchange for money, qualified as a Class D felony in violation of KRS 524.060, bribing a juror. That statute reads: "A person is guilty of bribing a juror when he offers, confers or agrees to confer any pecuniary benefit upon a juror with intent to influence the juror's vote, opinion, decision or other action as a juror."

At the very least, further inquiry about what effect the offered "bribe" may have had on the juror was important to Eversole. As it is, we have no way of knowing if the juror felt that one side or the other was responsible for the improper communication with her. We have no way to determine if the juror felt harassed or threatened—or how the interaction may have impacted her ability to remain unbiased in the case. If Eversole's counsel had been privy to

the bench conference, then Juror 262 could have been examined concerning possible bias. At that point, had she been found to be untainted and allowed to remain on the panel, the trial court could have then admonished her not to speak with the other jurors about the attempted bribe. However, because the trial court did not have counsel approach during the bench conference, none of those safeguards were provided here. And furthermore, no inquiry was made as to whether any other jurors had been similarly approached.

In *Bartley v. Commonwealth*, 400 S.W.3d 714 (Ky. 2013), we provided direction on how courts and jurors should handle circumstances in which jurors hear something they should not. In that case, a nurse testified about impermissible cigarette burn evidence. Our guidance in that case is helpful herein: "[t]he jurors were admonished, not to forget what they had heard, but rather to disregard it, *i.e.,* that whatever they thought about the nurse's cigarette-burn testimony they were to base their decisions solely on other evidence." *Id.* at 736. We noted, "[p]eople disregard what they know or what they think they know all the time." *Id.*

In this case, however, the juror who was offered a bribe was not admonished to disregard her encounter; nor did the trial court instruct her not to discuss the attempted bribe with her fellow jurors. We cannot reasonably expect this juror to forget being offered a bribe; however, as in *Bartley* a clearly worded admonition could reasonably be expected to guide the juror, ameliorate the damage, and maintain a fair trial. Without such an admonition or ability for counsel to question the juror regarding any potential bias, we cannot know whether the incident was considered during deliberations either by Juror 262

or any other jurors with whom she may have discussed her encounter. It is entirely possible that she may have assumed Eversole had something to do with the attempted bribe and could have been biased against him for that reason. We cannot determine that, however, as the parties were not afforded the opportunity to question the juror in this regard.

To be clear, we are not directing trial courts to automatically exclude a juror whenever an issue such as this arises during trial. We are confident that trial courts can properly exercise their discretion concerning issues—no matter their severity—that come up during a trial. However, we are directing judges to adopt the better practice of making counsel aware of ex parte juror conversations with the trial court, either by including counsel in the conversation with a juror from the outset of the conversation or informing counsel immediately after the conversation occurs.

As we have held, "[t]he test is whether, after having heard all of the evidence, the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict." *Mabe v. Commonwealth*, 884 S.W.2d 668, 671 (Ky. 1994). Given the lack of the presence of counsel during the bench conference and the lack of questions posed by the trial court, the trial judge had no evidence on which to determine whether the "prospective juror could conform [her] views to the requirements of the law and render a fair and impartial verdict." *Id.* The trial court should have permitted counsel to make reasonable requests and motions in response to the information the juror provided. Herein, the trial court should have conducted further questioning about potential bias due to the attempted bribe—or allowed counsel to do so.

Trial courts routinely empanel alternate jurors for just such contingencies as occurred here. Trial courts cannot be expected to prevent all inappropriate communications with jurors from happening; however, trial courts are expected to take reasonable steps in response to those communications.

We hold that Eversole was denied representation at a critical stage of his trial through the trial court's ex parte discussion with a juror who had been offered a bribe. This amounted to structural error as it denied him of his right to an impartial jury. We reverse Eversole's conviction, vacate the corresponding sentence, and remand this matter to the trial court for further proceedings consistent with this opinion.

## B. Directed Verdict

Eversole asserts the trial court erred when it failed to grant directed verdict motions for first-degree wanton endangerment and first-degree fleeing or evading. The issue was preserved by Eversole's motions for directed verdict at the close of the Commonwealth's case and at the close of evidence. After careful review, we affirm the trial court's denial of the directed verdict motions.

The legal standards for a directed verdict motion are clear: "[i]f under the evidence as a whole it would not be clearly unreasonable for a jury to find the defendant guilty, he is not entitled to a directed verdict of acquittal." *Trowel v. Commonwealth*, 550 S.W.2d 530, 533 (Ky. 1977). "The trial court must draw all fair and reasonable inferences from the evidence in favor of the party opposing the motion, and a directed verdict should not be given unless the evidence is insufficient to sustain a conviction. The evidence presented must be accepted as true. The credibility and the weight to be given the testimony

are questions for the jury exclusively." *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983). The standard for appellate review is equally clear: "[o]n appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

### 1. Identity

Eversole's first claim is the Commonwealth failed to prove he was the driver of the white pickup truck and, therefore, it should have granted his motion for directed verdict as to both fleeing or evading and wanton endangerment. A review of the record reveals the Commonwealth relied entirely on Sergeant Inman's identification of Eversole as the driver of the white pickup truck. Sergeant Inman testified that he was 100% certain Eversole was the driver he saw when the vehicles were window-to-window on the one-lane country road.

In deciding a motion for directed verdict, the trial court must view the evidence in the light most favorable to the Commonwealth. As noted above, the trial court must accept the evidence as true. *Id.* at 186. The jury may find the evidence to be otherwise; however, that is solely the jury's prerogative. In this case, Eversole's counsel thoroughly cross-examined Sergeant Inman on available lighting, time of night, shortness of time to observe, failure to obtain a truck make, model or, license plate number, and the single-photograph identification made three days later. The jury could have found reasonable doubt for all those reasons, but the trial court is required to view the evidence

in the light most favorable to the Commonwealth and Sergeant Inman's testimony was sufficient to rule on directed verdict motions—and it did so in this case. The trial court did not err in denying the motion on the basis of the Commonwealth's proof that Eversole was the driver of the truck.

### 2. *Fleeing or Evading*

Eversole's next claim is that the trial court erred in denying his motion for a directed verdict on the fleeing or evading charge.

### a. *Direction to stop*

Included in this argument is his assertion that there was insufficient proof that Eversole failed to obey a direction to stop his vehicle or that there was even any proof he was directed to stop. Lacking sufficient evidence of a direction to stop, Eversole insists the trial court erred in denying his motion for a directed verdict on the fleeing or evading charge. We will begin with the fleeing or evading statute in analyzing this claim of error. KRS 520.095 states, in pertinent part:

(1) A person is guilty of fleeing or evading police in the first degree:

> (a) When, while operating a motor vehicle with intent to elude or flee, the person knowingly or wantonly disobeys a direction to stop his or her motor vehicle, given by a person recognized to be a police officer, and at least one (1) of the following conditions exists:
>
> . . .
>
> > 4. By fleeing or eluding, the person is the cause, or creates substantial risk, of serious physical injury or death to any person or property; or

Sergeant Inman testified he did not expressly tell the truck driver to stop; rather, he turned his emergency lights on and off and he pulled over enough for the pickup truck to pass his cruiser, side-by-side on the one-lane road. When the pickup truck was even with his cruiser, Sergeant Inman said "hey" in an attempt to start a conversation with the truck's driver. However, the driver did not respond to Inman or stop to hear the rest of the attempted conversation. The rate of speed he employed on the one-lane country road while leaving was a clear indication that he knew the officer wanted Eversole to stop and speak with him—and of Eversole's intention to disregard the officer's attempt to get him to stop. Furthermore, Sergeant Inman was not the only officer that evening who attempted to stop the white pickup truck.

When the pickup truck encountered Deputy Jones on Lockaby Lane, the deputy had his emergency lights on and his cruiser blocking the single-lane road. Addressing a vehicle approaching a cruiser or other emergency vehicle sitting in such a posture, KRS 189.930 provides in pertinent part:

> (5) Upon approaching a stationary emergency vehicle or public safety vehicle, when the emergency vehicle or public safety vehicle is giving a signal by displaying alternately flashing yellow, red, red and white, red and blue, or blue lights, a person who drives an approaching vehicle shall, while proceeding with due caution:
>
> (a) Yield the right-of-way by moving to a lane not adjacent to that of the authorized emergency vehicle, if:
>
> 1. The person is driving on a highway having at least four (4) lanes with not fewer than two (2) lanes proceeding in the same direction as the approaching vehicle; and
>
> 2. If it is possible to make the lane change with due regard to safety and traffic conditions; or

(b) Reduce the speed of the vehicle, maintaining a safe speed to road conditions, if changing lanes would be impossible or unsafe.

Here, since changing lanes was impossible on a single-lane road, pursuant to KRS 189.930, the driver of the truck should have reduced his speed, maintaining a safe speed for a one-lane road in the dark. However, the driver did no such thing. Once the deputy saw the white pickup truck was not going to stop or even slow down (and was, indeed, accelerating), he was forced to drive his cruiser out of the way and into a ditch to avoid a head-on collision. It is reasonable inference that Deputy Jones obviously wanted the pickup truck to stop—and "maintaining a safe speed" pursuant to KRS 189.930 would have included Eversole stopping the truck completely once he neared the cruiser which was blocking the road with emergency lights activated.

We have previously said about reasonable inferences:

An inference is the act performed by the jury of inferring or reaching a conclusion from facts or premises in a logical manner so as to reach a conclusion. A reasonable inference is one in accordance with reason or sound thinking and within the bounds of common sense without regard to extremes or excess. It is a process of reasoning by which a proposition is deduced as a logical consequence from other facts already proven.

*Martin v. Commonwealth*, 13 S.W.3d 232, 235 (Ky. 1999).

A reasonable inference that can be drawn from a police cruiser blocking a single-lane road with its emergency lights on is that approaching vehicles should stop—not proceed at an unsafe speed for the roadway and conditions, and even accelerate head-long into the stopped emergency vehicle. The logical consequence of these facts was a visible, non-verbal direction to approaching drivers to stop their vehicles.

### b. Substantial risk of injury or death

Eversole also asserts that the proof was insufficient as to the element of the fleeing or evading charge requiring the jury to find a substantial risk of injury or death. In his brief, Eversole points to other cases where the risk and actual injuries were severe and, by implication, the risk in this case paled in comparison. While Sergeant Inman may have not been placed at a substantial risk of serious physical injury or death (as Eversole passed him at a low rate of speed, only speeding up once he had passed Inman's cruiser) the same is not true of the risk created toward Deputy Jones. Jones had to move his cruiser almost completely off the road and into a ditch because the one-lane country road was too narrow for two cars to pass.

Deputy Jones testified that he saw the white pickup truck crest a hill and accelerate toward him at an estimated speed of 40-45 miles per hour. The truck never swerved or veered and kept heading straight toward his cruiser, forcing Deputy Jones to drive out of the way and into a ditch. Due to a height differential between the pickup truck and his cruiser, Deputy Jones was concerned that if there were a collision, the truck would come over the top of his car's hood and straight into the cab of his cruiser. In his testimony, Deputy Jones expressed concern over the outcome of that collision and his chances of surviving it. The fleeing or evading statute does not require risk to multiple persons or even actual injury. The *risk* of death or serious physical injury to Deputy Jones was substantial and sufficient to survive the motion for directed verdict.

Eversole argues that the Commonwealth's proof was insufficient to support a finding of guilt beyond a reasonable doubt. The two officers' testimony was relatively short in length, but clear as to what happened on Lockaby Lane. Both officers readily acknowledged the gaps in the investigation including not being able to determine the make and model of the truck or the license plate number. However, those shortcomings do not mean the jury could not find proof beyond a reasonable doubt.

"Our courts have long held that a jury is free to believe the testimony of one witness over the testimony of others." *Minter v. Commonwealth*, 415 S.W.3d 614, 618 (Ky. 2013). "The testimony of a single witness is enough to support a conviction." *Id.* at 618 (citing *Gerlaugh v. Commonwealth*, 156 S.W.3d 747, 758 (Ky. 2005)). Further, "[t]he testimony of even a single witness is sufficient to support a finding of guilt, even when other witnesses testified to the contrary if, after consideration of all of the evidence, the finder of fact assigns greater weight to that evidence." *Commonwealth v. Suttles*, 80 S.W.3d 424, 426 (Ky. 2002).

Under the evidence presented it would not "be clearly unreasonable for a jury to find guilt." *Benham*, 816 S.W.2d at 187. Therefore, the trial court did not abuse its discretion in its denial of Eversole's motions for directed verdict.

### 3. *Wanton Endangerment*

Eversole also argues the trial court erred in failing to grant his motion for a directed verdict as to wanton endangerment. KRS 508.060(1) provides: "A person is guilty of wanton endangerment in the first degree when, under circumstances manifesting extreme indifference to the value of human life,

he wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person."

Eversole argues that there was insufficient evidence that his behavior occurred under "circumstances manifesting extreme indifference to the value of human life." However, we disagree. As noted in the previous subsection, Deputy Jones testified that Eversole drove a truck which sat high enough to come into the cab of his cruiser at a speed around 40-45 miles per hour. Jones said Eversole was accelerating as he approached his cruiser, which was blocking the road and had its emergency lights activated. Just as his conduct created a substantial risk of serious physical injury or death to support the fleeing or evading charge, it created "substantial danger of death or serious physical injury" as to the wanton endangerment charge. Furthermore, we have "held that whether wanton conduct demonstrates extreme indifference to human life is a question to be decided by the trier of fact." *Brown v. Commonwealth*, 975 S.W.2d 922, 924 (Ky. 1998).

We hold that there was sufficient evidence for the trial court to submit this issue to the jury. Therefore, the trial court did not err in denying Eversole's motion for a directed verdict.

### C. Unanimous Verdict, Uncharged Prior Bad-Acts Evidence and Penalty-Phase Jury Instructions

Because we are reversing on other grounds, we will not address Eversole's remaining issues. A court must instruct the jury based on the evidence presented in the case before it. We will not speculate as to what that evidence will be on remand, and, therefore, will not decide these issues today.

## III. CONCLUSION

After careful review of the issues presented, we reverse Eversole's convictions, vacate their corresponding sentences, and remand to the trial court for further proceedings consisted with this opinion.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Shannon Renee Dupree
Assistant Public Advocate

Jared Travis Bewley
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Kristin Leigh Conder
Assistant Attorney General