# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: FEBRUARY 19, 2026
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0190-MR

BRICE RHODES                                                        APPELLANT

V.
ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE JULIE KAELIN, JUDGE
NO. 16-CR-001891

COMMONWEALTH OF KENTUCKY                                             APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

A Jefferson County jury convicted Brice Rhodes of three counts of murder, tampering with physical evidence, and two counts of abuse of a corpse. He was sentenced to life without parole and appeals as a matter of right. KY. CONST. § 110(2)(b). Finding no error, we affirm.

**<u>BACKGROUND</u>**

On May 4, 2016, Christopher Jones was shot while walking along South 41st Street in Louisville, Kentucky. He died shortly thereafter at the hospital. On May 22, 2016, the severely burned bodies of brothers Maurice Gordon (14) and Larry Ordway (16) were discovered behind an abandoned house in the 400 block of Riverpark Drive. The investigation of the three murders led to the

arrests of Rhodes (25), Anjuan D. Carter (15)[1], Jacorey Taylor (17), and Tieren Coleman (18).

Carter and Taylor are cousins. They met Gordon and Ordway at school, became friends, and hung out. Rhodes met Gordon and Ordway when he dated their mother. He met Carter and Taylor through Gordon and Ordway and knew them about a month before the murders. Rhodes often suggested ideas for the group, such as going out to eat. In early May 2016, Rhodes and the four teenagers were smoking in someone's backyard. Rhodes told the others he knew of a person with "some money on [his] head" and "just needed a gun." Taylor got a gun and gave it to Rhodes.

On the night of the intended hit, the group left Rhodes's apartment in two vehicles. Carter drove a truck he had stolen earlier. He followed Gordon, who was driving Rhodes's light blue Mazda. Rhodes, armed with a gun, sat in the back behind Gordon. Taylor sat next to him. Ordway sat in the front passenger seat. After driving around for thirty to forty-five minutes, the vehicles stopped on South 41st Street. Rhodes rolled the window down, said, "Get [off] the street, bitch," and fired the gun, striking Jones, a person unknown to the group, but who allegedly looked like the target of the hit.

Rhodes shot Jones in his right arm. The bullet exited his arm and entered his right side, becoming lodged in his chest. Carter ran over Jones with

---

[1] Following youthful offender hearings, Carter and Taylor were transferred from juvenile court to circuit court.

the truck. He felt a bump under his tire. The medical examiner testified that Jones died from a gunshot wound.

After shooting Jones, the group drove away, leaving him in the street. Rhodes then fired the gun into an unknown person's residence a few houses down the street. It is unclear why Rhodes shot Jones and then fired the weapon into an unknown person's residence. The subject of the "hit" was never identified. Carter followed the others back to Gordon and Ordway's house. They did not talk about the shooting. Carter said they "just let it go," but he "expected to get some money." Carter said he burned the stolen truck because Rhodes thought it was "like on [surveillance] camera or something."

The Louisville Metro Police Department (LMPD) responded to a "shots fired" call on South 41st Street. Detective Brian Griffin arrived at the scene and canvassed the surrounding neighborhood. He did not locate any witnesses. He went to the University of Louisville Hospital, where he learned that Jones had died. During a subsequent canvass of the neighborhood, Detective Griffin obtained footage from a surveillance camera facing the street, showing Jones walking down the street and two vehicles approaching. The initial investigation did not reveal any suspects and eventually went cold.

On May 21, Carter, Gordon, Ordway, Coleman, and two other people met at Rhodes's house. The group was smoking and drinking. Sometime that night, Gordon and Taylor got into an argument. Rhodes asked Gordon if he had told on them. Rhodes believed that Ordway and Gordon would talk to the police because he thought that they had told their mother about Jones's murder. At

3

some point, Gordon aggressively pulled a knife on Taylor. Rhodes took the knife and smacked Gordon. Then Rhodes said that he intended to "violate" Gordon, which, according to Carter, meant he intended to inflict pain.

Because Rhodes believed Gordon and Ordway had betrayed him, he told the group, "We got to kill 'em.'" The group restrained Ordway and moved him to the bathroom. Rhodes called for a vote on whether Gordon and Ordway should be killed. Carter testified that he was the only one who voted against the murders. However, Taylor testified that both he and Carter voiced an objection. Gordon pleaded for his life. Someone put a sock in Gordon's mouth, tied his hands behind his back with a belt, and placed a hat over his head. Rhodes laid sheets down on the floor.

Rhodes told Taylor to punch Gordon in the chest. Then, Rhodes began repeatedly stabbing him in his chest and stomach. He continued until Gordon stopped breathing. Blood soaked the sheets and the carpet. Eventually, the group moved Gordon near the door. Then they took Ordway out of the bathroom. At that point, Ordway was restrained similarly to his brother—sock in his mouth, hat over his eyes, and his hands tied behind his back with a belt. Although Ordway tried to break free, he was unsuccessful, and Rhodes stabbed him to death.

After Ordway died, Rhodes passed the knife around so that everyone there would "be in on it." To that end, Carter stabbed Ordway several times. Afterward, Carter handed the knife back to Rhodes, who then passed it to someone else. Taylor also stabbed Ordway's body once or twice; Ordway was

4

not alive at that point. Both Taylor and Carter testified that they only stabbed Ordway. Rhodes also made two other people participate in the stabbing after Ordway and Gordon were already dead.

Subsequently, Rhodes made the group, including Carter and Taylor, put the bodies into totes and load them into the Mazda. Rhodes and the group were supposed to transport the totes to an abandoned house and burn them. But Rhodes instructed Carter and Taylor to stay in the residence and clean up the blood. Rhodes's mother and sister, who shared the apartment, were out of town and due back the next morning. So, Carter and Taylor worked through the night, scrubbing the floors with rags and bleach. When Rhodes returned, he was alone and helped with the clean-up effort.

When Carter and Taylor finished cleaning the house, they put the cleaning supplies in bags and loaded them into the Mazda. Then, Rhodes drove Taylor and Carter to different dumpsters, and the group used gasoline to light them on fire. Carter had Gordon's phone and was using it. At some point, Gordon's mother called him, and Carter answered, telling her that Gordon and Ordway were in the store. She did not find Carter's behavior suspicious and hung up. Meanwhile, Taylor hid his black boots in his girlfriend's cousin's closet because they had blood on them.

Detective Aaron Tinelli testified at trial. He was the lead detective assigned to the case after someone notified law enforcement of two badly burned bodies behind a vacant lot at 428 Riverpark Drive. Detective Tinelli went to the scene and noticed that there were no signs of a struggle. He

5

concluded that there was a chance that they had not been killed at that location.

Law enforcement could not identify the bodies. So, Detective Tinelli contacted a forensic artist and asked her to create images of the two children for the news. After the sketches were shared, law enforcement received a tip from the assistant principal at Olmsted Middle School, who believed she recognized the boys. This led to the boys' mother, who positively identified her two boys from the pictures.

Detective Tinelli asked the boys' mother why she had not filed a missing persons report. She responded that she had been in contact with one of her son's friends, who said they were at the store. She also provided law enforcement with a phone number. Eventually, the U.S. Marshals pinged the phone associated with that number and located Carter's whereabouts. He was subsequently arrested.

Although Carter's first interview was unproductive, he decided to give another statement after discussing the matter with his family. In his second interview, his story generally aligned with his trial testimony. Carter was told Rhodes was "throwing him under the bus," and he told officers the murders were all orchestrated by Rhodes.

Carter mentioned Taylor in his statement, which led to Taylor's arrest. Initially, Taylor denied knowing anything about the case. However, he later gave another statement that revealed more details about the murders. Based on Carter's statement, officers obtained a second search warrant for Rhodes's

6

residence after having already executed a warrant there.[2] The second warrant sought forensic evidence.

Law enforcement sprayed luminol in Rhodes' residence, which revealed blood on the carpet and some artificial foliage. For further testing, law enforcement removed the rug from the living room. Ultimately, forensic analysis determined that the male DNA profile from the carpet samples matched Ordway.

When law enforcement found the Mazda, they noted that (1) a strong bleach smell emanated from it, (2) the back seat was missing from it, and (3) a window was down. At one point, law enforcement began looking at recently reported dumpster fires to locate the backseat. Although they did not recover the backseat, their search did yield some evidence relevant to the case.

Specifically, law enforcement found remnants of a dumpster fire that appeared to contain various items with blood on them, including bedding. Later, testing of cuttings from a blanket revealed a male DNA profile that matched Gordon. Law enforcement also collected the boots that Taylor had hidden, which showed a presumptive positive result for blood. Additional testing revealed that DNA from the left boot matched Gordon.

Eventually, law enforcement arrested Rhodes. He provided a recorded interview and denied knowing anything about the murders. In July 2016, a

---

[2] The first search warrant was for potential murder weapons.

grand jury indicted Rhodes[3] on three counts of capital murder, tampering with physical evidence, and two counts of abuse of a corpse; protracted pre-trial proceedings ensued. The Commonwealth sought the death penalty, and Rhodes filed a motion to exclude death due to his intellectual disability and severe mental illness. After an evidentiary hearing, the trial court granted the motion.

Following an eight-day jury trial in December 2023[4], in which Carter and Taylor testified against Rhodes, a Jefferson County jury found Rhodes guilty of three counts of murder, two counts of abuse of a corpse, and one count of tampering with physical evidence. The jury recommended a life-without-parole sentence for each of the three murder counts, five years on the tampering charge, and one year on each of the abuse-of-a-corpse charges. The jury also recommended that Rhodes's sentences run consecutively. Ultimately, the trial court sentenced Rhodes to concurrent life-without-parole sentences. This appeal followed. Additional facts will be set forth below as needed for context.

## ANALYSIS

On appeal, Rhodes raises five arguments. First, he contends that the trial court erred in denying him conflict-free counsel. Second, he asserts that the trial court should have held a *Faretta*[5] hearing to determine whether he

---

[3] Carter, Taylor and Coleman were also indicted for the three murders and tampering with physical evidence. All three pleaded guilty. Carter and Taylor testified against Rhodes. Coleman did not testify.

[4] The trial was delayed several times due to changes in counsel, the trial court, and the COVID-19 pandemic.

[5] *Faretta v. California,* 422 U.S. 806, 807 (1975).

8

could represent himself. Third, Rhodes argues that he was entitled to instructions on the offenses of first-degree manslaughter and facilitation to commit murder. Fourth, he maintains that the trial court violated his right to present mitigating evidence related to his family's mental health. Finally, he claims that the trial court erred in denying his request for a change of venue. All issues raised were preserved.

We review these allegations of error for an abuse of discretion. *Roberson v. Commonwealth*, 694 S.W.3d 272, 279 (Ky. 2024); *see also Taylor v. Commonwealth*, 671 S.W.3d 36, 41 (Ky. 2023). In our review, we must give great deference to the trial court's decisions "because the trial court is in the best position to evaluate the evidence." *Bailey v. Commonwealth*, 194 S.W.3d 296, 304 (Ky. 2006) (quoting *Miller v. Eldridge*, 146 S.W.3d 909, 917 (Ky. 2004)). We will reverse only if the trial court acted arbitrarily, unreasonably, unfairly, or in a manner that was unsupported by sound legal principles. *Taylor*, 671 S.W.3d at 41 (citation omitted); *see also Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

We will now review the allegations of error in the order in which Rhodes presents them.

### 1. The trial court did not err in denying Rhodes's request to remove defense counsel (Tom Griffiths) from his case.

Rhodes contends that the trial court erred in denying his motion to remove his defense counsel, Tom Griffiths, whom Rhodes alleges was burdened by a conflict of interest. Rhodes's argument has two dominating points. First,

he complains that Griffiths had previously represented the uncle of two of his victims. Second, Rhodes contends that his relationship with Griffiths had deteriorated to the point that all communication had broken down. Rhodes argues that these two issues are intertwined and must be reviewed together.

The trial court held multiple hearings regarding Rhodes's defense counsel. In February 2017, the Department of Public Advocacy (DPA) sent a stand-in attorney for that purpose. At that time, the trial court noted that Rhodes's last two attorneys had withdrawn. Stand-in counsel reported that DPA needed more time to find a lawyer for Rhodes.

On May 11, 2017, the trial court informed the parties that the chief public advocate stated he had exhausted all contacts with attorneys on the assigned counsel list and was having difficulty finding someone willing to take this case. "He's certainly aware of the impact it's having with regards to Mr. Rhodes personally . . . but it is just very, very, very challenging," the trial court said.

On September 21, 2017, Griffiths made his first appearance as Rhodes's appointed counsel. From the start, Rhodes voiced concerns regarding a conflict between himself and Griffiths. On November 21, 2017, Griffiths informed the trial court that Rhodes wanted to fire the team and have them replaced with other counsel. The trial court expressed skepticism, stating that because this is a capital case, Rhodes "would be perfectly content . . . on simply never getting to trial because he never had a lawyer." Despite its misgivings, the trial court conducted an ex parte hearing with Rhodes.

10

At the hearing, Rhodes said that Griffiths had represented a relative of Ordway. Rhodes was worried Griffiths's relationship with a former client's family would impact his representation. Griffiths said he had represented Ordway's uncle in 2014 in a capital murder case but had not had contact with the family since 2014. The Commonwealth told the trial court that it did not see it as a conflict. The Commonwealth informed the trial court that one of the victims is a member of the Ordway family and that many of his family members committed crimes and are currently incarcerated. The Commonwealth did not plan on calling any members of the Ordway family to testify, explaining that none had any actual knowledge of the case. The trial court told Rhodes that Griffiths's prior representation of Ordway's uncle was not a conflict "as a matter of law." Rhodes told the trial court, "You say they're just kin, but at the same time they're still his family." Griffiths also explained that the uncle was currently serving a sentence of life with the possibility of parole after 25 years.

Moreover, Rhodes expressed concern about the lack of progress on his case. The trial court told Rhodes that Griffiths and his co-counsel, Jessica Buck,[6] just have been "very late getting in the game because we had to go find somebody who was both (A) available, (B) competent, and (C) would represent you for basically no money—as you might imagine that's a really, really, short

---

[6] During the seven-year pendency of the case, Griffiths had several attorneys appointed as co-counsel. Buck, who entered the case as Schulte but later married and changed her name, withdrew from the case. Warren Beck left the agency. Eventually, Thiasa Howorth and Wesley Boyarski assisted Griffiths at trial.

list." The trial court said, "this isn't the end of it," Rhodes could raise concerns in the future. They would take up the issue again.

On May 14, 2019, Rhodes raised the conflict issue again. At a second ex parte hearing, Rhodes revisited Griffiths's relationship with the Ordway family. Again, Griffiths told the trial court that he had not had contact with the Ordway family since 2014, "but he's right that prior to that I did have extensive contact with them." Griffiths said it was not interfering with his ability to represent Rhodes.

Rhodes said he and Griffiths "had heated words; we had an argument that almost led to a physical altercation." Griffiths said Rhodes became upset, and he asked Rhodes to lower his voice. According to Griffiths, Rhodes rejected his request that he lower his voice, "and then we went into an exchange of words from there, and I had to restrain myself." To explain his behavior, Rhodes cited the purported conflict of interest involving Griffiths's successive representation.

Griffiths addressed Rhodes's concerns on the record. As for the purported conflict, Griffiths again mentioned that he had not had contact with Ordway or his family since around August 2014. Griffiths also claimed that he did not believe that it was "interfering with [his] ability to represent Mr. Rhodes." Griffiths, the trial court, and Rhodes also engaged in an exchange about the purported confrontation. Rhodes again described the encounter and reiterated that he "had to restrain" himself.

The trial court asked the defense team whether they had filed motions that Rhodes wanted to pursue. Rhodes also expressed disappointment in Griffiths's failure to file motions on his behalf, including a motion for a change of venue. Griffiths said that many of Rhodes's requests were "vague." The trial court admonished Rhodes that it takes time to prepare certain motions. The trial court reiterated that if it removed Griffiths from the case, it would be challenging to find a lawyer willing to take his case. The trial court warned that the second chair, Jessica Buck, might also be recused and was not qualified to handle a capital case without co-counsel.

In a third ex parte hearing on September 27, 2019, Rhodes claimed that he and Griffiths "exchanged words" that were racist, and "a table got flipped over." And at some point, "the guards came in and broke it up." Still, Rhodes appeared to acknowledge that he and Griffiths did not "lay hands on each other."

Griffiths admitted he had serious concerns about his ability to do as good a job for Rhodes "as we want." He told the trial court he was concerned that Rhodes would be left without counsel if he were to withdraw. "So that may be the best answer I can give the court."

In that appearance, Rhodes expressed that he wanted to remove both of his attorneys because they were "both trying to railroad" him. When the court asked Griffiths about his thoughts on the representation, he expressed his concerns that Rhodes would not be able to obtain an attorney.

The trial court stated that it would "table" Rhodes's motion regarding his representation for now "with the idea that Rhodes and Rhodes's family is going to try to retain someone." The court explained that "the moment that somebody else shows up and says, 'I've been retained, I'm ready to go, I'm competent' his current defense team will be gone."

But Rhodes was not moved. He reiterated that he could not "be around nowhere near" Griffiths "for both of [their] safeties." He later reemphasized that "me and this man is . . . a safety hazard." In response, the trial court said it would contact the head of the local public defenders' office to explain the situation. In the meantime, Rhodes claimed that he "refuse[d] to have any contact" with Griffiths "to save [himself] from getting in trouble." But Rhodes agreed that Griffiths could still "send [him] things."

In a pretrial conference on October 31, 2019, the trial court informed the parties that it had discussed Rhodes's representation with Damon Preston, Kentucky's Public Advocate. He indicated that they struggled to find someone who could represent Rhodes. Mr. Griffiths is who they have. Mr. Preston also wanted the court to know that he had great confidence in Mr. Griffiths and that he is considered their go-to guy in challenging cases with severe consequences potentially at the end of the rainbow. He did not give the trial court any hope that, if it took Mr. Griffiths off, they could find anyone to represent Rhodes of a similar caliber.

Ultimately, the trial court suggested that Rhodes try to make it work. But Rhodes said that he could not make it work and that Griffiths needed to be

14

removed from the case. Regardless, the trial court again suggested that it would remove Griffiths when Rhodes retained new counsel.

Rhodes's dissatisfaction with Griffiths continued throughout the proceedings. On October 15, 2021, Rhodes again asked for Griffiths to be removed, saying Griffiths was trying to sabotage his case. Rhodes asked for a *Faretta* hearing and to proceed pro se until he could retain private counsel. In the meantime, the trial court ordered a competency evaluation, and Rhodes was sent to KCPC[7] for evaluation.

On March 2, 2023, Rhodes again requested the removal of counsel. He also stated that he and his attorney had no communication. The trial court said it could not address the motion while a competency issue was pending, but would address it on the day of the competency hearing.

The trial court held a competency hearing on April 21, 2023. Dr. Timothy Allen testified that he believed that Rhodes would be able to assist his attorneys in preparing a defense if he chose to do so. Later, Dr. Allen added that "some of [Rhodes's complaints] are legitimate concerns about racial issues in our justice system, and then some of them are exaggerations and fabrications by Mr. Rhodes. At one point, Rhodes told Dr. Allen that—from his perspective—he did not have attorneys. He claimed that he had no contact with his attorneys. He also said that he did not want attorneys and that he could defend himself.

---

[7] Kentucky Correctional Psychiatric Center.

15

Griffiths explained that Rhodes's pro se pleadings demonstrate that he "does not want his lawyers and will not work with his lawyers." In the context of Rhodes's competency determination, Griffiths also said: "He has run off multiple attorneys, Judge . . .He will not speak to me, as is in the record, and hasn't for years. He does not—and it's really not disputed—he does not participate rationally in his own defense."

The Commonwealth acknowledged Rhodes's complicated history with his attorneys and that he chose not to participate in his defense. Rhodes openly expressed displeasure with his attorneys, asked for new attorneys, and asked to represent himself. In the end, Rhodes clearly refused to communicate with his attorneys in open court. The trial court also acknowledged Rhodes's intense distrust of his defense attorneys. Rhodes told the trial court that he intended to retain other counsel rather than represent himself.

### a. Griffiths' representation did not create an actual conflict.

The Sixth Amendment provides that a criminal defendant has the right to "the Assistance of Counsel for his [defense]." U.S. CONST. amend. VI. The right to counsel includes "the right to effective assistance of counsel." *Strickland v. Washington,* 466 U.S. 668 (1984). Furthermore, effective assistance "includes the right to representation free from conflicts of interest." *Steward*, 397 S.W.3d at 883 (quoting *Rubin v. Gee,* 292 F.3d 396, 401 (4th Cir. 2022)). An attorney's conflict of interest may violate a defendant's Sixth Amendment right to counsel. *See Commonwealth v. Tigue*, 459 S.W.3d 372, 385 (Ky. 2015). Moreover, a court presumes prejudice "when counsel is burdened by an actual conflict of

16

interest." *Id.* (quoting *Smith v. Robbins*, 528 U.S. 259, 287 (2000)). Indeed, this Court has been clear that a defendant is not automatically entitled to a different attorney:

> a defendant who is represented by a public defender or appointed counsel does not have a constitutional right to be represented by any particular attorney, and is not entitled to the dismissal of his counsel and the appointment of substitute counsel except for adequate reasons or a clear abuse by counsel.

*Henderson v. Commonwealth*, 636 S.W.2d 648, 651 (Ky. 1982). This Court has also listed "good cause" when a defendant may be entitled to another attorney: "(1) a complete breakdown of communications between counsel and defendant; (2) a conflict of interest; and (3) where the legitimate interests of the defendant are being prejudiced." *Grady v. Commonwealth*, 325 S.W.3d 333, 344 (Ky. 2010) (quoting *Deno v. Commonwealth*, 177 S.W.3d 753, 759 (Ky. 2005)). Still, this Court has emphasized how difficult it is to make that showing. "[T]he bar is set high for a defendant to force appointed counsel off the case . . . [M]ere dissatisfaction with appointed counsel's performance is insufficient to support a motion to support his removal." *Henderson v. Commonwealth*, 563 S.W.3d 651, 669 (Ky. 2018) (citations omitted) (quoting *Stinnett v. Commonwealth*, 364 S.W.3d 70, 81 (Ky. 2011)).

Rhodes alleges that Griffiths's representation of the victims' uncle constituted successive representation. He cites *Steward v. Commonwealth*, 397 S.W.3d 881 (Ky. 2012) to support this contention. However, *Steward* is distinguishable. In *Steward,* the trial court found that defense counsel engaged

17

in successive representation of the appellant and a potential witness, having represented the witness through his guilty plea before trial and the appellant during his second sentencing phase. *Id.* at 883-84.

"Successive representation occurs where defense counsel has previously represented a co-defendant or trial witness." *Moss v. United States*, 323 F.3d 445, 459 (6th Cir. 2003). Rhodes contends that Griffiths's 2014 representation of Ordway's family member constitutes successive representation. We disagree. The family member was neither a co-defendant nor a witness and did not constitute successive representation under *Moss.*

Rhodes argues that even if the trial court viewed Griffiths's prior representation of Ordway to be free of conflict, Rhodes saw someone who had a close relationship with the victims' family. While the trial court may not have deemed this a conflict of interest as a matter of law, Rhodes believed it led to a complete breakdown of communication and an irreconcilable conflict.

Whether a conflict exists must be "determined on a case-by-case basis," based on the facts and circumstances presented. *Grady*, 325 S.W.3d at 346. Rhodes has failed to prove that Griffiths's representation fell below an objective standard of reasonableness. There is no indication that Griffiths was limited in any way by his previous representation of Ordway's family member. Thus, there was no actual conflict.

### b. Rhodes's relationship with Griffiths had not deteriorated to the extent that it created a conflict of interest.

Next, Rhodes contends that he had a conflict of interest with his attorney because communication between them had broken down completely. During

18

the seven years pre-trial, the trial court conducted three ex parte hearings and several pre-trial conferences at each of which Rhodes expressed his desire to remove Griffiths from the case, arguing that communications between the two had utterly broken down. Even if Rhodes's relationship with his attorney was less than ideal, he has not shown that the trial court abused its discretion in denying relief—because Rhodes never provided a legitimate reason for refusing to work with his trial counsel.

In *Henderson*, this Court stated:

> [S]o long as the trial court allows the defendant to state on the record the reasons why he seeks substitution of counsel, the trial court may exercise discretion to determine how extensive the hearing needs to be in light of the factual circumstances of each individual case.

*Henderson*, 563 S.W.3d at 669 (quoting *Grady*, 325 S.W. 3d at 346). The same is true here. The trial court held several hearings on Rhodes's allegations. It allowed Rhodes ample time to discuss his reservations, complaints, and allegations regarding his attorney's conduct and his previous representation. The trial court also permitted defense counsel to respond to Rhodes's complaints. Given all the evidence, statements, and conduct before the trial judge, the court did not abuse its discretion in denying Rhodes's motion. Like Henderson, Rhodes has failed to show that the trial court abused its discretion in denying his motion to remove his attorneys.

Admittedly, Griffiths stated on the record that Rhodes had not spoken to him in years. The most critical reason Rhodes cannot complain here is that he had no legitimate reason to refuse to work with Griffiths. In short, Rhodes

19

cannot manufacture "good cause" by his own abusive and uncooperative behavior. *See United States v. Vasquez*, 560 F.3d 461, 468 (6th Cir. 2009). Because Rhodes refused to speak to Griffiths, he cannot claim that there was a complete breakdown in communication between them. The reasons Rhodes posited for counsel's removal are insufficient and unfounded, as shown by the record. The trial court did not abuse its discretion in finding that Rhodes failed to show good cause to substitute counsel.

### 2. The trial court did not err in not holding a *Faretta* hearing and did not misadvise him about his choices for representation.

Rhodes insists that the trial court erred in failing to hold a *Faretta* hearing after defense counsel, at Rhodes's request, filed a motion to do so. Rhodes also filed several pro se motions. The trial court allowed Rhodes to argue some of the motions pro se, even though they were often antagonistic to defense counsel. And, in a related argument, he asserts that the trial court misrepresented his options for proceeding with counsel. But both arguments lack merit for the same reason—the record shows that Rhodes merely wanted one or more different attorneys and failed to state that he wanted to represent himself at trial unequivocally. On more than one occasion, Rhodes reiterated that he did not wish to represent himself.

"*Faretta* requires that a defendant seeking self-representation be 'made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.'" *Commonwealth v. Terry*, 295 S.W.3d 819, 822 (Ky. 2009)

20

(quoting *Faretta*, 422 U.S. at 835). And generally, "once a defendant invokes his right to proceed pro se, in whole or part, the trial court is required to hold the *Faretta* hearing and allow the defendant to exercise the right, if at all possible." *Swan v. Commonwealth*, 384 S.W.3d 77, 93 (Ky. 2012).

Still, a defendant is not automatically entitled to a *Faretta* hearing. Instead, this Court has explained that "[t]he defendant . . . must clearly indicate that he desires to dispense with counsel's services in whole or in part and to substitute himself for counsel." *Commonwealth v. Martin*, 410 S.W.3d 119, 123 (Ky. 2013). The *Martin* Court further reasoned that "where the defendant does not to any extent seek to waive counsel, there can be no need to warn him against the perils of waiver." *Id.* Additionally, the *Martin* Court explained "[i]t is not enough for a defendant merely to express dissatisfaction with counsel, to demand new counsel, to 'fire' one's counsel, or to lodge *pro se* motions[.]" *Id.* at 122-23 (citations omitted).

Here, Rhodes did not successfully trigger *Faretta* with his statements. See *Winstead v. Commonwealth*, 283 S.W.3d 678, 683-84 (Ky. 2009) (declining to find that the defendant had unequivocally requested self-representation and noting that the defendant's pro se motions "stop short . . . of seeking to dispense with counsel, in whole or in part, and to proceed *pro se*"). Regardless of Rhodes's other statements about counsel, he explicitly stated that he did not want to represent himself. So, he abandoned any request for a hearing.

The trial court delayed ruling on the matters about Rhodes's counsel until after his competency determination. After that hearing, Rhodes raised the

21

matter of his counsel again. But at that time, Rhodes explicitly stated that he did not want to represent himself. Given this assertion, the trial court had no reason to hold a *Faretta* hearing. Under these circumstances, Rhodes abandoned any right he had to a *Faretta* hearing. Thus, the trial court did not err in denying Rhodes' motion to hold a *Faretta* hearing.

Next, Rhodes contends that the circuit court erred by misrepresenting his options for proceeding to trial as a false dichotomy: more specifically, he alleges that the court erred by indicating that he could choose either to represent himself or to proceed with appointed counsel. By extension, Rhodes insinuates that the trial court should have specifically mentioned the possibility of his employing hybrid or standby counsel.

Rhodes filed several pro se motions. On October 15, 2021, he said he wanted to represent himself, but when asked to clarify, Rhodes indicated on the record that he merely wanted different attorneys. On April 21, 2023, he expressly told the court that he did not wish to represent himself. This is far from an unequivocal pronouncement to represent oneself.

Rhodes indeed asked for a *Faretta* hearing. At one point, he claimed he would rather represent himself than proceed with the attorneys assigned to his case. But a review of the entire record reveals that Rhodes did not really want to represent himself—instead, he wanted to fire his appointed attorneys until he could afford to hire a different one, though he was never able to do so.

On this record, the trial court adequately examined Rhodes's desire for self-representation. And given his representations to the trial court, he is not

22

entitled to relief. The trial court did not misrepresent Rhodes's options under the circumstances and did not err in declining to conduct a *Faretta* hearing.

### 3. The trial court did not err in denying Rhodes's request for first-degree manslaughter and facilitation instructions for each murder.

Rhodes contends the trial court erred in denying his request for lesser-included jury instructions of first-degree manslaughter and facilitation on all three homicides. Rhodes tendered the requested jury instructions, and the trial court denied the motion. The evidence supported neither instruction.

It is the duty of the trial judge to prepare and give instructions on the whole law of the case. RCr[8] 9.54(1). "[A] trial judge must give instructions on any lesser-included offenses supported by the evidence." *Sasser v. Commonwealth*, 485 S.W.3d 290, 296 (Ky. 2016). A court may decline to give such an instruction where the only viable theory based on the evidence is that the defendant is either guilty of the greater offense or he is innocent. *Oakes v. Commonwealth*, 320 S.W.3d 50, 58 (Ky. 2010).

"[A] defendant has a right to have every issue of fact raised by the evidence and material to the defense submitted to the jury on proper instructions." *Allen v. Commonwealth*, 338 S.W.3d 252, 255 (Ky. 2011). While lesser-included offenses are not themselves a defense, they are "in fact and principle, a defense against the higher charge." *Id.* (quoting *Hudson v. Commonwealth*, 202 S.W.3d 17, 20 (Ky. 2006)). For this reason, lesser-included offenses are encompassed within a defendant's right to present a

---

[8] Kentucky Rules of Criminal Procedure.

defense. However, "an instruction on a lesser-included offense is appropriate if, and only if, on the given evidence a reasonable juror could entertain a reasonable doubt of the defendant's guilt on the greater charge but believe beyond a reasonable doubt that the defendant is guilty of the lesser charge." *Id.* (quoting *Osborne v. Commonwealth*, 43 S.W.3d 234, 244 (Ky. 2001)).

KRS[9] 505.020(2) establishes whether a charge is a lesser-included offense. In part, that provision states that a

> defendant may be convicted of an offense that is included in any offense with which he is formally charged. An offense is so included when . . . [i]t is established by proof of the same or less than all the facts required to establish the commission of the offense charged . . .

KRS 505.020(2)(a).

Still, defendants are not automatically entitled to instructions on lesser-included offenses. Indeed, trial courts must "instruct on a lesser-included offense only 'if the evidence would permit the jury to rationally find the defendant not guilty of the primary offense, but guilty of the lesser offense.'" *Lackey v. Commonwealth*, 468 S.W.3d 348, 355 (Ky. 2015) (quoting *Brown v. Commonwealth*, 313 S.W.3d 577, 626-27 (Ky. 2010)).

Rhodes contends he was entitled to a facilitation instruction on all three murders. KRS 506.080(1) sets forth when a defendant facilitates a crime:

> A person is guilty of criminal facilitation when, acting with knowledge that another person is committing or intends to commit a crime, he engages in conduct which knowingly provides such person with means or

---

[9] Kentucky Revised Statutes.

24

opportunity for the commission of the crime and which in fact aids such person to commit the crime.

"Facilitation reflects the mental state of one who is 'wholly indifferent' to the actual completion of the crime." *Baker v. Commonwealth*, 545 S.W.3d 267, 280 (Ky. 2018) (quoting *Perdue v. Commonwealth*, 916 S.W.2d 148, 160 (Ky. 1995), *overruled on other grounds* by *Huddleston v. Commonwealth*, 542 S.W.3d 237 (Ky. 2018)).

One commits first-degree manslaughter when one intends to cause serious physical injury to the victim but causes their death. KRS 507.030(1)(a). That provision delineates four circumstances in which a person is guilty of first-degree manslaughter, including one in which defendants act with the intent to commit serious physical injury: "[w]ith intent to cause serious physical injury to another person, he or she causes the death of such person or a third person[.]" *Id.*

The evidence at trial established that Rhodes was the most culpable in the deaths of Ordway and Gordon. He was the adult in the group. The murders were his idea. Rhodes began stabbing both. He instructed the teenagers on what to do. Rhodes directed others to stab Ordway and Gordon. He also made the group put the bodies into totes and load them into the Mazda. He also instructed Carter and Taylor to stay at the residence to clean up the blood from the murders.

There was no evidence that Rhodes did not intend for Ordway and Gordon to die. Nor was there evidence that he was "wholly indifferent" to the crimes—instead, he was the mastermind. For these reasons, the jury would

25

have needed to convict Rhodes of murder in connection with the boys' deaths or nothing at all, and facilitation and first-degree manslaughter instructions were completely unwarranted.

Rhodes makes an identical argument for Jones's murder, and it fails for similar reasons. The jury could not have rationally acquitted Rhodes of Jones's murder and convicted him of either facilitation or first-degree manslaughter. The jury could only infer that Rhodes intended Jones's death from his actions before, during, and after the shooting.

> Proof of intent . . . may be inferred from the character and extent of the victim's injuries. Intent may be inferred from actions because a person is presumed to intend the logical and probable consequences of his conduct and a person's state of mind may be inferred from actions preceding and following the charged offense.

*Parker v. Commonwealth*, 952 S.W.2d 209, 212 (Ky. 1997).

Rhodes's actions surrounding Jones's murder compel the conclusion that he could not have committed first-degree manslaughter or acted to facilitate Jones's death. First, Rhodes discussed killing someone—albeit a different person—before the shooting. To reiterate, it was Rhodes who mentioned the murder-for-hire to the group. Even if this fact alone is insufficient to establish that he intended Jones's death, it still shows that Rhodes intended to kill that night.

Second, Rhodes shot into a nearby house immediately after shooting Jones. He cannot argue that he merely attempted to injure someone in that house, given that he fired at it for no apparent reason. Because Rhodes

26

discussed killing someone before the murder and then shot indiscriminately into a house afterward, it is implausible that Rhodes merely intended to injure Jones.

Third, Rhodes and the others drove off rather than attempt to render aid. After the shooting, the group apparently left Jones lying in the street, even after Rhodes shot him and Carter ran over him. If Rhodes had merely wanted to injure Jones, he presumably would have sought medical assistance afterward. *See Murphy v. Commonwealth*, 50 S.W.3d 173, 179 (Ky. 2001). The fact that the group left Jones lying on the street after he had been shot and possibly run over showed that they intended his death. *Id.*

Fourth, Rhodes attempted to conceal Jones's homicide by murdering two witnesses to that crime. That is also evidence that Rhodes intended Jones's death. *See Welborn v. Commonwealth*, 157 S.W.3d 608, 615 (Ky. 2005) ("Flight and attempt at concealment are circumstantial evidence of guilt because they suggest a guilty state of mind."); *Murtaugh v. Commonwealth*, 579 S.W.2d 619, 621 (Ky. 1979) (noting that an appellant's "attempt to conceal [the victim's] death could reasonably be interpreted as circumstantial evidence of guilt").

Together, these facts support the conclusion that Rhodes intended to kill Jones. Any reasonable person should know that Jones would have been highly likely to die if left in the road after being shot and likely run over by a car. That Rhodes tried to cover up the crime afterward by murdering two witnesses only makes that conclusion that much clearer.

27

By contrast, there was no proof that Rhodes intended to injure Jones. Because Rhodes failed to introduce any evidence to cast doubt on Taylor and Carter's testimony, the jury could not have rationally disbelieved their account of the events in this case. *See Dixon v. Commonwealth*, 263 S.W.3d 583, 587 (Ky. 2008) (detailing the defendant's involvement and determining that no facilitation instruction was warranted). In other words, the jury necessarily would have needed to believe Taylor and Carter—and thus find Rhodes guilty of murder—or disbelieve them and vote for acquittal. *See Lawton v. Commonwealth*, 354 S.W.3d 565, 576 (Ky. 2011). Accordingly, the trial court did not err by denying either instruction.

### 4. The trial court did not err in denying Rhodes's request to present evidence of other family members' mental health records.

Rhodes argues that the trial court erred by excluding evidence in mitigation of his sentence. Citing *Commonwealth v. Barroso*, Rhodes opines that a relative's medical records may have been helpful in the penalty phase. 122 S.W.3d 554 (Ky. 2003). A defendant must be "permitted to present any and all relevant mitigating evidence that is available[.]" *Davis v. Coyle*, 475 F.3d 761, 774 (6th Cir. 2007) (quoting *Skipper v. South Carolina*, 476 U.S. 1, 8 (1986). Any mitigating evidence that could prove or disprove a fact of value to the factfinder is relevant. *Tennard v. Dretke*, 542 U.S. 274, 284 (2004). Once the low threshold for relevance is met, a jury must be allowed to weigh mitigating evidence. *Id.* at 285.

Rhodes argues that the trial court erred in denying his motion to review in camera his sister's mental health records because they fell under the exception to the patient privilege delineated in KRE[10] 507 (c)(3). We disagree.

KRE 507 (c)(3) states:

> If the patient is asserting that patient's mental condition as an element of a claim or defense, or, after the patient's death, in any proceeding in which any party relies upon the condition as an element of a claim or defense.

To be clear, the patient privilege mentioned in KRE 507 belongs to Rhodes's sister, the patient, not Rhodes. There is no evidence that she waived said privilege or that she is deceased. Even if Rhodes's sister had waived her right to privacy and to disclosure, or if she were deceased at the time of the disclosure, the records were at best cumulative. The jury already heard mental-health evidence; there is no chance that additional evidence about Rhodes's sister's medical history would have changed the outcome. *See Wong v. Belmontes*, 558 U.S. 15, 23 (2009) (citation omitted) ("The sentencing jury was . . . 'well-acquainted' with Belmontes' background and potential humanizing features . . . Additional evidence on these points would have offered an insignificant benefit, if any at all.); *Nichols v. Heidle,* 725 F.3d 516, 542 (6th Cir. 2013) ("While the additional testimony may have been more 'vivid,' 'detailed,' or 'distressing,' it was not new—all of these basic facts had been introduced[.]").

---

[10] Kentucky Rules of Evidence.

Rhodes argued that severe mental illness in a family member can bear on a defendant's upbringing and childhood. Defense counsel informed the trial court that Rhodes's sister had been treated at three different hospitals for mental illness. Still, they could not confirm the severity of her mental illness or the specific diagnoses without an opportunity to review the records. Rhodes's sister had told the defense team she was diagnosed with schizophrenia and possibly a mood disorder. The defense team clarified that they wanted to use her mental health history for mitigation purposes.

The trial court denied the motion for an in-camera review, saying it had not seen a case where a relative's medical records had been used to show that, because a family member was diagnosed with mental illness, it would be more likely that a defendant suffered from mental illness. The trial court held that the need for mitigating evidence in this case did not outweigh his sister's right to privacy. The trial court agreed to seal the records for appellate review. We have reviewed the documents and agree with the trial court.

During the penalty phase, Rhodes submitted mitigating evidence, including evidence of severe mental illness in Rhodes's family. Dr. James Garbarino, an expert in developmental psychology, testified about the Adverse Childhood Experience Scale, or "ACES." He noted that he believed Rhodes had two relatives with suspected schizophrenia. Dr. Garbarino concluded that Rhodes had eight out of ten ACES factors, which were important in understanding how he came to be such a "damaged" person. Dr. Garbarino also testified that he would be surprised if mental health issues were not

present. Dr. Garbarino did not include one additional point on the ACES for a family member with mental illness living with Rhodes. Dr. Gabarino testified that, though he suspected other family members were diagnosed with mental illness, he did not have proof of that fact. Arguably, Rhodes's sister's mental health records would have provided that proof. That additional point, however, would have scored Rhodes a nine instead of an eight—an insignificant difference based on the totality of all the mitigation evidence.

Additionally, Dr. Joetta James testified in mitigation. She is a clinical psychologist and clinical neuropsychologist. Her role was to determine whether Rhodes was intellectually disabled. She did not interview Rhodes because he declined to meet with her. However, she based her diagnosis on her review of Rhodes's school records, medical records, summary of interviews with relatives, and psychological testing. She testified that, based on a reasonable degree of psychological certainty, Rhodes met the criteria for intellectual disability and continues to do so. She also testified that Rhodes was previously diagnosed with ADHD and bipolar disorder. Dr. James also testified about the impact these diagnoses had on Rhodes growing up, and how an intellectual disability manifests during one's developmental years.

Rhodes introduced mitigating evidence about his mental-health history and his family's mental-health history. The jury learned that Rhodes was diagnosed with attention deficit hyperactivity disorder and bipolar disorder. The jury also learned that at least two of Rhodes's relatives were diagnosed with schizophrenia. The jury heard that if you have relatives who have

schizophrenia, your risk is greater for developing it. At best, the requested mental health records were cumulative with very little, if any, additional probative value.

The trial court did not err when it denied Rhodes's request to present evidence of other family members' mental health records.

### 5. The trial court did not err in denying Rhodes's request for a change of venue.

Finally, Rhodes argues that the trial court erred in denying his request for a change of venue. The Commonwealth concedes that there was a considerable amount of pretrial publicity, but more than seven years passed between the commission of the crimes and voir dire.

Rhodes timely moved for a change of venue, both orally and in writing. Notably, Rhodes's case was not the typical high-profile murder case. In this case, defense counsel had to take the unprecedented step of asking the trial court to enjoin prior defense counsel from continuing negative social media commentary and posts about Rhodes. Coincidentally, the prior defense counsel was present in the courtroom. He acknowledged posting about Rhodes in recent months but argued that local media coverage, not his site, was the primary source of prejudice against Rhodes. Nonetheless, he agreed to take down the video.

In May 2019, defense counsel filed another motion for change of venue, and a hearing was held. The defense presented evidence on change-of-venue surveys in civil and criminal cases across several states over the years. Mykol C. Hamilton, who has a Ph.D. in social psychology, testified that Rhodes's

ability to get a fair trial in Jefferson County would be "difficult, if not impossible" due to the high number of people who recognized the case and were prejudiced towards a guilty verdict. He also surveyed potential jurors in Fayette County. Defense counsel argued the case should be tried in Fayette County. However, Rhodes expressed his view that neither Jefferson nor Fayette County was an appropriate venue; instead, the case needed to be moved "far, far away" due to pretrial publicity.

The trial court said it would look into the issue further, but its initial view was that it had held high-profile trials in Jefferson County and could do so again. The trial court also said there might not be a better venue, due to the racial makeup of other counties and the need for a multi-courtroom building. Thereafter, the trial court denied the motion. We note, however, that the trial did not take place for another four-and-a-half years.

"Under both the due process clause and KRS 452.210, the defendant is entitled to a change of venue if it appears that he cannot receive a fair trial in the county where the prosecution is pending." *Dunn v. Commonwealth*, 360 S.W.3d 751, 768-69 (Ky. 2012). Additionally, "[i]t is not the amount of publicity which determines that venue should be changed; it is whether public opinion is so aroused as to preclude a fair trial." *Kordenbrock v. Commonwealth*, 700 S.W.2d 384, 387 (Ky. 1985); *see also Skilling v. United States*, 561 U.S. 358, 385 (2010) ("Although publicity about a codefendant's guilty plea calls for inquiry to guard against actual prejudice, it does not ordinarily . . . warrant an automatic presumption of prejudice.").

33

Kentucky jurisprudence shows that the amount of pretrial publicity alone is not dispositive. Indeed, this Court has upheld a trial court's decision not to transfer venue when the vast majority of jurors were subjected to pretrial publicity. *See Wood v. Commonwealth,* 178 S.W.3d 500, 513-14 (Ky. 2005) (affirming the trial court's denial of a change of venue motion where "approximately 95 percent of the members of the jury pool had been exposed to pretrial publicity").

Importantly, Rhodes committed these crimes in May 2016, and voir dire began on December 11, 2023. Rhodes does not identify any prejudicial pretrial publicity immediately before the start of the trial that he brought to the trial court's attention. He also does not identify any specific jurors' responses during voir dire that would indicate a prejudiced jury pool, or that "public opinion [was] so aroused as to preclude a fair trial." *Kordenbrock* 700 S.W.2d at 387.

Had there been a tremendous response of prejudice due to pretrial publicity, that would have been brought to this Court's attention. Rhodes has not pointed to anything that would cast doubt on the trial's outcome. The media coverage in this case does not illustrate the kind of inflamed sentiment required to mandate a venue transfer. *See Hubers v. Commonwealth,* 617 S.W.3d 750, 773 (Ky. 2020). The trial court entered its order denying Rhodes's motion for a change of venue in 2019. Based on the seven-year gap between the commission of the offense and Rhodes's trial, the four-year gap between entry of the order and the trial, and the lack of any evidence that there was any additional pretrial publicity closer in time to the actual trial, any prejudice to

34

Rhodes was ameliorated. Thus, the trial court did not err in denying Rhodes's motion for a change of venue.

## **CONCLUSION**

For the foregoing reasons, we affirm the Jefferson Circuit Court.

All sitting. Lambert, C.J.; Bisig, Conley, Goodwine, Keller, and Nickell, JJ., concur. Thompson, J., concurs in result only.

COUNSEL FOR APPELLANT:

Erin Hoffman Yang
Kathleen K. Schmidt
Assistant Public Advocates

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General

Christopher Henry
Assistant Attorney General